HITCHMAN COAL & COKE COMPANY *v.* MITCHELL, INDIVIDUALLY, ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 11. Argued March 2, 3, 1916; restored to docket for reargument March 13, 1916; reargued December 15, 18, 1916.—Decided December 10, 1917.

The District Court has no power to decree an injunction against parties who were not served with process and who appeared only to object to the jurisdiction over them.

In order that the declarations and conduct of third parties may be admissible against persons sued with respect to acts done to carry out an alleged conspiracy, a combination between them and the defendants must be shown by independent evidence; but the criminal or otherwise unlawful character of the combination may be shown by the declarations themselves.

The same liberty which enables men to form unions, and through the unions to enter into agreements with employers willing to agree, entitles other men to remain independent of the union and other employers to agree with them to employ no man who owes any allegiance or obligation to the union. In the latter case as in the former the parties are entitled to be protected by the law in the enjoyment of the benefits of any lawful agreement they may make.

The right of action for persuading an employee to leave his employer, universally recognized, rests upon fundamental principles of general application.

The right of workingmen to form unions and to enlarge their membership by inviting other workingmen to join is conceded, provided the objects of the union be proper and legitimate.

The right of workingmen to enlarge the membership of unions by inviting other workingmen to join, like other civil rights, must be exercised with reasonable regard for the conflicting rights of others; and the members of a union having notice that the employees of an establishment are under contract with their employer not to remain in his employ after joining the union, may not lawfully, for the purpose of unionizing the establishment through an actual or threatened strike, induce or seek to induce such employees to violate their contract by joining the union, or (what in equity is the same) by secretly agreeing to join, and thereafter remaining at work until sufficient new members can be obtained so as to bring about a strike, thus uniting with the union in a plan to subvert the system of employment to which they voluntarily have agreed and upon which their employer and their fellow-employees are relying.

An employer is entitled to the good-will of his employees, irrespective of the fact that they are employed at will and that the relation is terminable by either party at any time; he is entitled to the benefit of the reasonable probability that by properly treating them he will be able to retain them in his employ and to fill vacancies occurring from time to time by the employment of other men on the same terms. It is unlawful for a third party, having notice of this relation, to interfere with it without just cause or excuse.

Intentionally to do that which is calculated in the ordinary course of

events to damage and which does in fact damage another person in his property or trade, is malicious in law and actionable if done without just cause or excuse.

A proffered excuse can not be deemed a just cause or excuse where it is based upon an assertion of conflicting rights that are sought to be attained by unfair methods and for the very purpose of interfering with plaintiff's rights of which defendants have notice.

Any violation of plaintiff's legal rights, contrived by defendants for the purpose of inflicting damage, or having that as its necessary effect—for example, a combination to procure concerted breaches of contract by plaintiff's employees—is as plainly unlawful as if it involved a breach of the peace.

The purpose entertained by defendants to bring about a strike at plaintiff's mine in order to compel plaintiff, through fear of financial loss, to consent to the unionization of the mine as the lesser evil, was an unlawful purpose; and the methods resorted to by defendants—the inducing of employees to unite with the union in an effort to subvert the system of employment at the mine by concerted breaches of the contracts of employment known to be in force there—were unlawful and malicious methods, not to be justified as a fair exercise of the right to increase the membership of the union.

Convinced by costly strikes of the futility of attempting to operate under a closed-shop agreement with a certain union, plaintiff established its mine on a non-union basis, with the unanimous approval of its employees and under a mutual agreement, assented to by them all, that plaintiff would continue to run its mine non-union and not recognize the union; that if any man wanted to become a member of the union he was at liberty to do so, but he could not be a member and remain in plaintiff's employ. Under that agreement plaintiff ran its mine for a year and more, and, so far as appears, without the slightest disagreement between it and its men, and without any grievance on their part. Thereupon, defendants, having full notice of the agreement, and acting without any agency for the men, but as representatives of an organization of mine workers in other States, and in order to subject plaintiff to such participation by the union in the management of the mine as necessarily results from the making of a closed-shop agreement, sent their agent to the mine, who, with full notice of, and for the very purpose of subverting, the status arising from plaintiff's agreement and subjecting the mine to the union control, proceeded, without physical violence, indeed, but by persuasion accompanied with threats of a reduction of wages and deceptive statements as to the attitude of the mine management,

to induce plaintiff's employees to join the union and at the same time
to break their agreement with plaintiff by remaining in its employ
after joining; and this for the purpose not of enlarging the member-
ship of the union, but of coercing plaintiff, through a strike or the
threat of one, into recognition of the union. *Held*, that plaintiff
was clearly entitled to an injunction.

214 Fed. Rep. 685, reversed.

THE case is stated in the opinion.

*Mr. Hannis Taylor*, with whom *Mr. George R. E. Gil-
christ* was on the briefs, for petitioner.

*Mr. Charles E. Hogg* for respondents.

Space will not permit an adequate presentation of the
elaborate arguments submitted by opposing counsel.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was a suit in equity, commenced October 24, 1907,
in the United States Circuit (afterwards District) Court
for the Northern District of West Virginia, by the Hitch-
man Coal & Coke Company, a corporation organized
under the laws of the State of West Virginia, against
certain citizens of the State of Ohio, sued individually
and also as officers of the United Mine Workers of Amer-
ica. Other non-citizens of plaintiff's State were named
as defendants but not served with process. Those who
were served and who answered the bill were T. L. Lewis,
Vice President of the U. M. W. A. and of the International
Union U. M. W. A.; William Green, D. H. Sullivan, and
"George" W. Savage, (his correct Christian name is
Gwilym), respectively President, Vice President, and
Secretary-Treasurer of District No. 6, U. M. W. A.; and
A. R. Watkins, John Zelenka, and Lee Rankin, respec-
tively President, Vice President and Secretary-Treasurer
of Sub-district No. 5 of District No. 6.

Plaintiff owns about 5,000 acres of coal lands situate at or near Benwood, in Marshall County, West Virginia, and within what is known as the "Pan Handle District" of that State, and operates a coal mine thereon, employing between 200 and 300 men, and having an annual output, in and before 1907, of about 300,000 tons. At the time of the filing of the bill, and for a considerable time before and ever since, it operated its mine "non-union," under an agreement with its men to the effect that the mine should be run on a non-union basis, that the employees should not become connected with the Union while employed by plaintiff, and that if they joined it their employment with plaintiff should cease. The bill set forth these facts, *inter alia*, alleged that they were known to defendants and each of them, and "that the said defendants have unlawfully and maliciously agreed together, confederated, combined and formed themselves into a conspiracy, the purpose of which they are proceeding to carry out and are now about to finally accomplish, namely: to cause your orator's mine to be shut down, its plant to remain idle, its contracts to be broken and unfulfilled, until such time as your orator shall submit to the demand of the Union that it shall unionize its plant, and having submitted to such demand unionize its plant by employing only union men who shall become subject to the orders of the Union," etc. The general object of the bill was to obtain an injunction to restrain defendants from interfering with the relations existing between plaintiff and its employees in order to compel plaintiff to "unionize" the mine.

A restraining order having been granted, followed by a temporary injunction, the served defendants filed answers, and thereupon made a motion to modify the injunction, which was refused. 172 Fed. Rep. 963. An appeal taken by defendants from this order was dismissed by the Circuit Court of Appeals. 176 Fed. Rep. 549. Afterwards

they applied for and obtained leave to withdraw their answers and file others; the order, however, prescribed that the withdrawn answers were "not to be removed from the file." The new answers denied all material averments of the bill, some of which had been admitted in the former answers. Plaintiff, having filed replications, obtained an order that the former answers should be treated as evidence on behalf of the plaintiff upon the issue joined. Upon this evidence and other evidence introduced before the court orally, the case was submitted, with the result that a final decree was made January 18, 1913, granting a perpetual injunction. 202 Fed. Rep. 512. This was reversed by the Circuit Court of Appeals June 1, 1914 (214 Fed. Rep. 685), but the mandate was stayed pending an application to this court for a writ of certiorari. Afterwards an appeal was allowed. This court dismissed the appeal, but. granted the writ of certiorari (241 U. S. 644), the record on appeal to stand as a return.

The final decree of the District Court included an award of injunction against John Mitchell, W. B. Wilson, and Thomas Hughes, who while named as defendants in the bill were not served with process and entered no appearance except to object to the jurisdiction of the court over them. Under the federal practice, the appearance to object did not bind these parties to submit to the jurisdiction on the overruling of the objection (*Harkness* v. *Hyde*, 98 U. S. 476, 479; *Southern Pacific Co.* v. *Denton*, 146 U. S. 202, 206; *Mexican Central Ry. Co.* v. *Pinkney*, 149 U. S. 194, 209; *Goldey* v. *Morning News*, 156 U. S. 518; *Davis* v. *C., C., C. & St. L. Ry. Co.*, 217 U. S. 157, 174), and since the injunction operates only *in personam*, it was erroneous to include them as defendants. It also was erroneous to include personal relief by injunction against certain named parties who, pending suit, were chosen to succeed some of the original defendants as officers of the international, district, and sub-district

unions, but who were not served with process and did not appear, they being included upon the ground that they were "before the court by representation through service having been had upon their said predecessors in office." This suit was commenced, and was carried to final decree in the trial court, before the taking effect of· the present Equity Rules (226 U. S. 629), and hence is governed by the former Rule 48 (210 U. S. 524), under which the rights of absent parties were expressly reserved.

But these procedural difficulties do not affect that part of the decree which awarded an injunction against the answering defendants (Lewis, Green, Sullivan, Savage, Watkins, Zelenka, and Rankin) "individually" and not as officers of the Union or its branches except as to Savage, against whom the decree goes in both his individual and official capacities, he alone having retained at the time of the final decree the same office he held at the beginning of the suit. If there was error in excluding the "official" responsibility of the others, it was not one of which they could complain, and it was not assigned for error upon their appeal to the Circuit Court of Appeals. If they were subject to injunction at all, they were so in their individual capacities. Whether the decree will bind their successors in office, or their fellow-members of the Union, is a question to be determined hereafter, if and when proceedings are taken to enforce the injunction against parties other than the answering defendants.

We proceed, therefore, to consider the case as it stands against the answering defendants.

The District Court based its decision upon two grounds: (1) That the organization known as the United Mine Workers of America, and its branches, as conducted and managed at the time of the suit and for many years before, was a common-law conspiracy in unreasonable restraint of trade, and also and especially a conspiracy against the rights of non-union miners in West Virginia;

and (2) That the defendants, in an effort to compel the plaintiff to enter into contractual relations with the Union relating to the employment of labor and the production of coal, although having knowledge of express contracts existing between plaintiff and its employees which excluded relations with the Union, endeavored by unlawful means to procure a breach of these contracts by the employees.

A brief recital of previous transactions between the parties becomes material. The Union is a voluntary and unincorporated association which was organized in the year 1890 in the States of Ohio and Indiana, and afterwards was extended to other States. It is made up of national or "international," district, sub-district, and local unions. District No. 6 comprises the coal districts of Ohio and the Panhandle of West Virginia. Sub-district No. 5 of that district comprises five counties and parts of counties in Ohio, and the Panhandle.

The answering defendants were and are active and influential members—leaders—of the Union, as well as officers. Savage, Lewis, and Sullivan have been members from its formation in 1890, and have held important offices in it and attended the national conventions. The others are long-time members, and possessed an influence indicated by the offices they held, but not limited to the duties of those offices.

From 1897 to 1906 what were known as joint interstate conferences were held annually or biennially between officials of the Union and representatives of the operators in the "Central Competitive Field" (which includes Western Pennsylvania, Ohio, Indiana, and Illinois, but not West Virginia), for the purpose of agreeing upon the scale of wages and the conditions of employment in that field. In addition there were occasional conferences of the same character affecting other States and districts.

Plaintiff's mine is within the territorial limits of Subdistrict No. 5 of District No. 6.  Coal-mining operations were commenced there in the early part of the year 1902, and the mine was operated "non-union" until April, 1903, when, under threats from the Union officials, including defendants Watkins and Sullivan, that a certain unionized mine in Ohio, owned by the same proprietors, would be closed down if the men at the Hitchman were not allowed to organize, plaintiff consented to the unionization of the latter mine.  This went into effect on the 1st of April, 1903, and upon the very next day the men were called out on strike because of a disagreement with the company as to the basis upon which mining should be paid for.  The strike continued until May 23, requiring plaintiff to cease operations and preventing it from fulfilling its contracts, the most important of which was one for the daily supply of engine coal to the Baltimore & Ohio Railroad at a coaling station adjoining the mine.  The financial loss to plaintiff was serious.  The strike was settled and the men resumed work upon the basis of a modification of the official mining scale applicable to the Hitchman mine.

Again, in the spring of 1904, there was difficulty in renewing the scale.  A temporary scale, agreed upon between operators and miners for the month of April, 1904, was signed in behalf of the Hitchman Company on the 18th of April.  Two days later the men at the Hitchman struck, and the mine remained idle for two months, during which time plaintiff sustained serious losses in business and was put to heavy expense in obtaining coal from other sources to fill its contract with the Baltimore & Ohio Railroad Company.  The strike was settled by the adoption of the official scale for the Panhandle District, with amendatory local rules for the Hitchman mine.

After this there was little further trouble until April 1,

1906, when a disagreement arose between the Union and an association of operators with which plaintiff was not connected—the association being in fact made up of its competitors—about arranging the terms of the scale for the ensuing two years. At the same time a similar disagreement arose between the operators and the Union officials in the Central Competitive Field. The result was a termination of the interstate conferences and a failure to establish any official scale for the ensuing two years, followed by a widespread strike, or a number of concurrent strikes, involving the most of the bituminous coal-producing districts. There was absolutely no grievance or ground of disagreement at the Hitchman mine, beyond the fact that the mining scale expired by its own terms on March 31, and the men had not received authority from the Union officials either to renew it or to agree to a new one in its place. Plaintiff came to an understanding with the local union to the effect that if its men would continue at work the company would pay them from April 1st whatever the new scale might be, except that if the new scale should prove to be lower than that which expired on March 31, there should be no reduction in wages, while if the scale was raised the company would pay the increased amount, dating it back to April 1st. This was satisfactory to the men; but as the question of a new scale was then under discussion at a conference between the officials of the Union and the representatives of the Operators' Association, and plaintiff's employees wished to get the sanction of their officers, the manager of the Hitchman mine got into communication with those officials, including defendant Green, President of District No. 6, and endeavored to secure their assent to the temporary arrangement, but without success. Then a committee of the local union, including Daugherty, its President, took up the matter with Green and received permission to mine and load engine coal

until further notice from him. Under this arrangement the men remained at work for about two weeks. On April 15th, defendant Zelenka, Vice President of the sub-district, visited the mine, called a meeting of the miners, and addressed them in a foreign tongue, as a result of which they went on strike the next day, and the mine was shut down until the 12th of June, when it resumed as a "non-union" mine, so far as relations with the U. M. W. A. were concerned.

During this strike plaintiff was subjected to heavy losses and extraordinary expenses with respect to its business, of the same kind that had befallen it during the previous strikes.

About the 1st of June a self-appointed committee of employees called upon plaintiff's president, stated in substance that they could not remain longer on strike because they were not receiving benefits from the Union, and asked upon what terms they could return to work. They were told that they could come back, but not as members of the United Mine Workers of America; that thenceforward the mine would be run non-union, and the company would deal with each man individually. They assented to this, and returned to work on a non-union basis. Mr. Pickett, the mine superintendent, had charge of employing the men, then and afterwards, and to each one who applied for employment he explained the conditions, which were that while the company paid the wages demanded by the Union and as much as anybody else, the mine was run non-union and would continue so to run; that the company would not recognize the United Mine Workers of America; that if any man wanted to become a member of that union he was at liberty to do so; but he could not be a member of it and remain in the employ of the Hitchman Company; that if he worked for the company he would have to work as a non-union man. To this each man employed gave his assent, un-

derstanding that while he worked for the company he must keep out of the Union.

Since January, 1908 (after the commencement of the suit), in addition to having this verbal understanding, each man has been required to sign an employment card expressing in substance the same terms. This has neither enlarged nor diminished plaintiff's rights, the agreement not being such as is required by law to be in writing.

Under this arrangement as to the terms of employment, plaintiff operated its mine from June 12, 1906, until the commencement of the suit in the fall of the following year.

During the same period a precisely similar method of employment obtained at the Glendale mine, a property consisting of about 1,200 acres of coal land adjoining the Hitchman property on the south, and operated by a company having the same stockholders and the same management as the Hitchman; the office of the Glendale mine being at the Hitchman Coal & Coke Company's office. Another mine in the Panhandle, known as the Richland, a few miles north of the Hitchman, likewise was run "non-union."

In fact, all coal mines in the Panhandle and elsewhere in West Virginia, except in a small district known as the Kanawha field, were run "non-union," while the entire industry in Ohio, Indiana, and Illinois was operated on the "closed-shop" basis, so that no man could hold a job about the mines unless he was a member of the United Mine Workers of America. Pennsylvania occupied a middle ground, only a part of it being under the jurisdiction of the Union. Other States need not be particularly mentioned.

The unorganized condition of the mines in the Panhandle and some other districts was recognized as a serious interference with the purposes of the Union in the

Central Competitive Field, particularly as it tended to keep the cost of production low, and, through competition with coal produced in the organized field, rendered it more difficult for the operators there to maintain prices high enough to induce them to grant certain concessions demanded by the Union. This was the subject of earnest and protracted discussion in the annual international convention of the U. M. W. A. held at Indianapolis, Indiana, in the month of January, 1907, at which all of the answering defendants were present as delegates and participated in the proceedings. The discussion was based upon statements contained in the annual reports of John Mitchell, as President of the Union (joined as a defendant in the bill but not served with process), and of defendant Lewis, as Vice President, respecting the causes and consequences of the strike of 1906, and the policy to be adopted by the Union for the future. In these reports it was made to appear that the strike had been caused immediately by the failure of the joint convention of operators and miners representing the central and southwestern competitive fields, held in the early part of the year 1906, to come to an agreement for a renewal of the mining scale; that the strike was widespread, involving not less than 400,000 mine workers, was terminated by "district settlements," with variant results in different parts of the territory involved, and had not been followed by a renewal of the former relations between the operators and miners in the Central Competitive Field. Another result of the strike was a large decrease in the membership of the Union. Two measures of relief were proposed: first, that steps be taken to reëstablish the joint interstate conferences; and second, the organization of the hitherto unorganized fields, including the Panhandle District of West Virginia, under closed-shop agreements, with all men about the mines included in the membership of the United Mine Workers

of America. In the course of the discussion the purpose
of organizing West Virginia in the interest of the union-
ized mine workers in the Central Competitive Field,
and the probability that it could be organized only by
means of strikes, were repeatedly declared and were dis-
puted by nobody. All who spoke advocated strikes,
differing only as to whether these should be nation-wide
or sectional. Defendant Lewis, in his report, recom-
mended an abandonment of the policy of sectional settle-
ments which had been pursued in the previous year. This
recommendation, interpreted as a criticism of the policy
pursued under the leadership of President Mitchell in
the settlement of the 1906 strike, was the subject of long
and earnest debate, in the course of which Lewis said:
"When we organize West Virginia, when we organize the
unorganized sections of Pennsylvania, we will organize
them by a strike movement." And again, towards the
close of the debate: "No one has made the statement
that we can organize West Virginia without a strike."
Defendant Green took part, favoring the view of Mr.
Lewis that strikes should be treated nationally instead of
sectionally. In the course of his remarks he said: "I
say to you, gentlemen, one reason why I opposed the policy
that was pursued last year was because over in Ohio
we were peculiarly situated. We had West Virginia on
the south and Pennsylvania on the east, and after four
months of a strike in eastern Ohio we had reached the
danger line. We felt keenly the competition from West
Virginia, and during the suspension our mines in Ohio
chafed under the object lesson they had. They saw West
Virginia coal go by, train-load after train-load passing
their doors, when they were on strike. This coal sup-
plied the markets that they should have had. There is
no disguising the fact, something must be done to remedy
this condition. Year after year Ohio has had to go home
and strike in some portion of the district to enforce the

interstate agreement that was signed up here. . . . I confess here and now that the overwhelming sentiment in Ohio was that a settlement by sections would not correct the conditions we complained of. Now, something must be done; it is absolutely necessary to protect us against the competition that comes from the unorganized fields east of us." Mr. Mitchell opposed the view of defendant Lewis, reiterating an opinion, repeatedly expressed before, that West Virginia and the other unorganized fields, "would not be thoroughly organized except as the result of a successful strike"; but declaring that "they will not be organized at all, strike or no strike, unless we are able to support the men in those fields from the first day they lay down their tools. . . . Now, I believe it is possible, indeed I believe it is probable, that in the not distant future we will be able to inaugurate a movement in West Virginia and the other unorganized fields that will involve them in a strike, and then we will expect you to furnish the sinews of war, as you have done in the past, to keep these men in idleness."

The discussion continued during three days, and at the end of it the report of a committee which expressed disagreement with Vice President Lewis' opposition to sectional settlements and recommended "a continuation in the future of the same wise, conservative business-like policies" that had been pursued by President Mitchell, was adopted by a *viva voce* vote.

The plain effect of this action was to approve a policy which, as applied to the concrete case, meant that in order to relieve the union miners of Ohio, Indiana, and Illinois from the competition of the cheaper product of the non-union mines of West Virginia, the West Virginia mines should be "organized" by means of strikes local to West Virginia, the strike benefits to be paid by assessments upon the union miners in the other States mentioned, while they remained at work.

This convention was followed by an annual convention of Sub-district 5 of District 6, held in the month of March, 1907, at which defendants Watkins and Rankin were present as President and Secretary of the sub-district. Defendant Lewis, as National Vice President, occupied the chair during several of the sessions. Defendant Zelenka was present as a delegate, and also Thomas Hughes, who, while named as a defendant in the present suit, was not served with process. Watkins and Rankin in their reports recommended the complete unionization of the mines in the Panhandle counties, with particular reference to the Hitchman, the Glendale, the Richland, and two others; and as a result it was resolved "that the Sub-District officers, together with the District officers, be authorized to take up the work of organizing every mine in the Sub-District as quickly as it can be done."

Evidently in pursuance of this resolution, defendants Green, Zelenka, and Watkins, about July 1, 1907, called at plaintiff's office and laid before its general manager, Mr. Koch, a proposition for the unionization of the mine. He declined to consider it, but at their request laid it before plaintiff's board of directors, who rejected the proposition, and the manager informed Green of this. In one of the interviews Koch informed these defendants of the terms of plaintiff's working agreement with its employees to the effect that the mine was to be run non-union and they were not to become members of the Union.

About the same time, a Mr. McKinley, who was operating the Richland mine non-union, was interviewed by the Union leaders, notified of the resolution adopted by the sub-district convention, and, having asked that his mine be let alone, was met with the threat that they would secure the support of his men, and that if he did not recognize the Union they would shut down his mine.

In one of the interviews that ensued he was told that it was their purpose to organize the Glendale, the Hitchman, the Richland, and some other mines; that at the Glendale they had twenty-four men who had joined the organization, "and that they had sixty men who had signed up or had agreed to join the organization at Hitchman, and that they were going to shut the mine down as soon as they got a few more men." With respect to their progress at his own mine he was kept in the dark until about the middle of October, 1907, when, through the activities of the organizer Hughes, they succeeded in shutting it down, and it remained closed until a restraining order was allowed by the court, immediately after which it resumed non-union.

The evidence renders it clear that Hughes was sent into the Panhandle to organize all the mines there, in accordance with the resolution of the sub-district convention. The bill made a statement of his activities, and alleged that he was acting as an organizer for the Union. Defendants' final answers made a complete denial, but in this are contradicted by admissions made in the earlier answers and by other and undisputed evidence. The only defendant who testified upon the subject declared that Hughes was employed by District No. 6 as an organizer, but denied that he had power or authority to shut down the Hitchman mine.

He arrived at that mine some time in September, 1907, and remained there or in that vicinity until the latter part of October, conducting a campaign of organization at the Hitchman and at the neighboring Glendale and Richland mines.

The evidence shows that he had distinct and timely notice that membership in the Union was inconsistent with the terms of employment at all three mines, and a violation of the express provisions of the agreement at the Hitchman and Glendale.

Having unsuccessfully applied to Koch and McKinley for their coöperation, Hughes proceeded to interview as many of the men as he could reach and to hold public meetings in the interest of the Union. There is clear and uncontradicted evidence that he did not confine himself to mere persuasion, but resorted to deception and abuse. In his public speeches he employed abusive language respecting Mr. Pickett, William Daugherty, and Jim Jarrett.[1] He prophesied, in such a way that ignorant, foreign-born miners, such as he was addressing, naturally might believe him to be speaking with knowledge, that the wages paid by the Hitchman would be reduced unless the mine was unionized. The evidence as to the methods he employed in personally interviewing the miners, while meagre, is significant. Myers, a Hitchman miner, testified: "He told me that he was a good friend of Mr. Koch, and that Mr. Koch had nothing against having the place organized again. He said he was a friend of his, and I made the remark that I would ask Mr. Koch and see if it was so; and he said no, that was of no use because he was telling me the truth." He did not confine his attentions to men who already were in plaintiff's employ, but in addition dissuaded men who had accepted employment from going to work.

A highly significant thing, giving character to Hughes' entire course of conduct, is that while his solicitation of the men was more or less public, as necessarily it had to be, he was careful to keep secret the number and the names of those who agreed to join the Union. Myers, being asked to allow his name to be entered on a book

---

[1] Mr. Pickett was superintendent of the Hitchman and Glendale mines, and it was with him that the miners made their agreements to refrain from membership in the Union; Daugherty and Jarrett were miners at the Hitchman, and had been, respectively, President and Financial Secretary of the local union at the time of the 1906 strike, when the local deserted the U. M. W. A.

that Hughes carried, tried to see the names already entered, "but he would not show anything; he told me he had it, and I asked him how many names was on it, and he said he had about enough to 'crack off.'" To Stewart, another Hitchman miner, he said "he was forming a kind of secret order among the men; he said he had a few men—he did not state the number of them—and he said each man was supposed to give him so much dues to keep it going, and then he said after he got the majority he would organize the place." Pickett, the mine superintendent, had learned of only five men at the Glendale who were inclined to join Hughes' movement; but when these were asked to remain outside of the mine for a talk, fifteen other men waited with them, and upon being reminded that while the company would not try to prevent them from becoming mem- of the Union, they could not be members and at the same time work for the Glendale Company, they all accepted this as equivalent to a notice of discharge. And, as has been stated, the owner of the Richland, while repeatedly threatened with unionization, was kept in the dark as to the progress made by the organizer amongst his employees until the mine was actually shut down.

The question whether Hughes had "power or authority" to shut down the Hitchman mine is beside the mark. We are not here concerned with any question of *ultra vires*, but with an actual threat of closing down plaintiff's mine, made by Hughes while acting as agent of an organized body of men who indubitably were united in a purpose to close it unless plaintiff would conform to their wishes with respect to its management, and who lacked the power to carry out that purpose only because they had not as yet persuaded a sufficient number of the Hitchman miners to join with them, and hence employed Hughes as an "organizer" and sent him to the mine with the very

object of securing the support of the necessary number of miners. They succeeded with respect to one of the mines threatened (the Richland), and preparations of like character were in progress at the Hitchman and the Glendale at the time the restraining order was made in this cause.

If there be any practical distinction between organizing the miners and organizing the mine, it has no application to this case. Unionizing the miners is but a step in the process of unionizing the mine, followed by the latter almost as a matter of course. Plaintiff is as much entitled to prevent the first step as the second, so far as its own employees are concerned, and to be protected against irreparable injury resulting from either. Besides, the evidence shows, without any dispute, that defendants contemplated no half-way measures, but were bent on organizing the *mine*, the "consent" of plaintiff to be procured through such a control of its employees as would render any further independent operation of the mine out of the question. This is evident from the discussions and resolutions of the international and sub-district conventions, from what was said by defendants Green, Zelenka, and Watkins to plaintiff's manager, and to the operator of the Richland, and from all that was said and done by Hughes in his effort to organize the Hitchman, Glendale, and Richland mines.

In short, at the time the bill was filed, defendants, although having full notice of the terms of employment existing between plaintiff and its miners, were engaged in an earnest effort to subvert those relations without plaintiff's consent, and to alienate a sufficient number of the men to shut down the mine, to the end that the fear of losses through stoppage of operations might coerce plaintiff into "recognizing the union" at the cost of its own independence. The methods resorted to by their "organizer" were such as have been described. The legal consequences remain for discussion.

The facts we have recited are either admitted or else proved by clear and undisputed evidence and indubitable inferences therefrom. The proceedings of the international and sub-district conventions were shown by the introduction of official verbatim reports, properly authenticated. It is objected that these proceedings, especially in so far as they include the declarations and conduct of others than the answering defendants, are not admissible because the existence of a criminal or unlawful conspiracy is not made to appear by evidence *aliunde*. The objection is untenable. In order that the declarations and conduct of third parties may be admissible in such a case, it is necessary to show by independent evidence that there was a combination between them and defendants, but it is not necessary to show by independent evidence that the combination was criminal or otherwise unlawful. The element of illegality may be shown by the declarations themselves. The rule of evidence is commonly applied in criminal cases, but is of general operation; indeed, it originated in the law of partnership. It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them. *Pleasants* v. *Fant*, 22 Wall. 116, 119; *Connecticut Mutual Life Ins. Co.* v. *Hillmon*, 188 U. S. 208, 218; Story Part., §§ 107, 108; 1 Greenleaf Ev., §§ 112, 113 (184 b, c); 2 Starkie Ev. (2d ed.) 25, 26; *King* v. *Hardwick*, 11 East, 578, 585, 589; *Sandilands* v. *Marsh*, 2 Barn. & Ald. 673, 679; *Wood* v. *Braddick*, 1 Taunt. 104, 105; *Van Reimsdyk* v. *Kane* (Story, J.), 1 Gall. 630, 635; 28 Fed. Cas. 1067, 1069; *Aldrich* v. *Warren*, 16 Maine, 465,

468; *Pierce* v. *Wood*, 23 N. H. 519, 531; *Page* v. *Parker*, 40 N. H. 47, 62; *State* v. *Thibeau*, 30 Vermont, 100, 105; *Jenne* v. *Joslyn*, 41 Vermont, 478, 484; *Locke* v. *Stearns*, 1 Metc. 560, 563; *Lowe* v. *Dalrymple*, 117 Pa. St. 564, 568; *Main* v. *Aukam*, 4 App. D. C. 51, 56.

Upon a kindred principle, the declarations and conduct of an agent, within the scope and in the course of his agency, are admissible as original evidence against the principal, just as his own declarations or conduct would be admissible. *Barreda* v. *Silsbee*, 21 How. 146, 164, 165; *Vicksburg & Meridian Railroad* v. *O'Brien*, 119 U. S. 99, 104; *LaAbra Silver Mining Co.* v. *United States*, 175 U. S. 423, 498. And since the evidence of Hughes' agency is clear and undisputed—that as the representative of a voluntary association of which the answering defendants were active members, and in the execution of a purpose to which they all had given consent, and in which some of them were actively coöperating, he was engaged in an effort to organize the coal mines of the Panhandle District—it is equally clear that his declarations and conduct while so doing are evidential against the defendants.

What are the legal consequences of the facts that have been detailed?

That the plaintiff was acting within its lawful rights in employing its men only upon terms of continuing non-membership in the United Mine Workers of America is not open to question. Plaintiff's repeated costly experiences of strikes and other interferences while attempting to "run union" were a sufficient explanation of its resolve to run "non-union," if any were needed. But neither explanation nor justification is needed. Whatever may be the advantages of "collective bargaining," it is not bargaining at all, in any just sense, unless it is voluntary on both sides. The same liberty which enables men to form unions, and through the union to enter into agree-

ments with employers willing to agree, entitles other men to remain independent of the union and other employers to agree with them to employ no man who owes any allegiance or obligation to the union. In the latter case, as in the former, the parties are entitled to be protected by the law in the enjoyment of the benefits of any lawful agreement they may make. This court repeatedly has held that the employer is as free to make non-membership in a union a condition of employment, as the working man is free to join the union, and that this is a part of the constitutional rights of personal liberty and private property, not to be taken away even by legislation, unless through some proper exercise of the paramount police power. *Adair* v. *United States*, 208 U. S. 161, 174; *Coppage* v. *Kansas*, 236 U. S. 1, 14. In the present case, needless to say, there is no act of legislation to which defendants may resort for justification.

Plaintiff, having in the exercise of its undoubted rights established a working agreement between it and its employees, with the free assent of the latter, is entitled to be protected in the enjoyment of the resulting status, as in any other legal right. That the employment was "at will," and terminable by either party at any time, is of no consequence. In *Truax* v. *Raich*, 239 U. S. 33, 38, this court ruled upon the precise question as follows: "It is said that the bill does not show an employment for a term, and that under an employment at will the complainant could be discharged at any time for any reason or for no reason, the motive of the employer being immaterial. The conclusion, however, that is sought to be drawn is too broad. The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others. The employé has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion, and, by the weight

of authority, the unjustified interference of third persons is actionable although the employment is at will." (Citing many cases.)

In short, plaintiff was and is entitled to the good will of its employees, precisely as a merchant is entitled to the good will of his customers although they are under no obligation to continue to deal with him. The value of the relation lies in the reasonable probability that by properly treating its employees, and paying them fair wages, and avoiding reasonable grounds of complaint, it will be able to retain them in its employ, and to fill vacancies occurring from time to time by the employment of other men on the same terms. The pecuniary value of such reasonable probabilities is incalculably great, and is recognized by the law in a variety of relations. See *Brennan* v. *United Hatters*, (cited with approval in *Truax* v. *Raich, supra,*) 73 N. J. L. 729, 749; *Brown* v. *Honiss*, 74 N. J. L. 501, 514 *et seq.*; *Jersey City Printing Co.* v. *Cassidy*, 63 N. J. Eq. 759, 767; *Walker* v. *Cronin*, 107 Massachusetts, 555, 565–566; *Moran* v. *Dunphy*, 177 Massachusetts, 485, and cases there cited; *L. D. Wilcutt & Sons Co.* v. *Driscoll*, 200 Massachusetts, 110, 117, etc.

The right of action for persuading an employee to leave his employer is universally recognized—nowhere more clearly than in West Virginia—and it rests upon fundamental principles of general application, not upon the English statute of laborers. *Thacker Coal Co.* v. *Burke*, 59 W. Va. 253, 255; 8 Ann. Cas. 885, 886; *Walker* v. *Cronin*, 107 Massachusetts, 555, 567; *Angle* v. *Chicago, St. Paul &c. Ry. Co.*, 151 U. S. 1, 13; *Noice Adm'x.* v. *Brown*, 39 N. J. L. 569, 572.

We turn to the matters set up by way of justification or excuse for defendants' interference with the situation existing at plaintiff's mine.

The case involves no question of the rights of employees.

Defendants have no agency for plaintiff's employees, nor do they assert any disagreement or grievance in their behalf. In fact, there is none; but, if there were, defendants could not, without agency, set up any rights that employees might have. The right of the latter to strike would not give to defendants the right to instigate a strike. The difference is fundamental.

It is suggested as a ground of criticism that plaintiff endeavored to secure a closed non-union mine through individual agreements with its employees, as if this furnished some sort of excuse for the employment of coercive measures to secure a closed union shop through a collective agreement with the Union. It is a sufficient answer, in law, to repeat that plaintiff had a legal and constitutional right to exclude union men from its employ. But it may be worth while to say, in addition: first, that there was no middle ground open to plaintiff; no option to have an "open shop" employing union men and non-union men indifferently; it was the Union that insisted upon closed-shop agreements, requiring even carpenters employed about a mine to be members of the Union, and making the employment of any non-union man a ground for a strike; and secondly, plaintiff was in the reasonable exercise of its rights in excluding all union men from its employ, having learned, from a previous experience, that unless this were done union organizers might gain access to its mine in the guise of laborers.

Defendants set up, by way of justification or excuse, the right of workingmen to form unions, and to enlarge their membership by inviting other workingmen to join. The right is freely conceded, provided the objects of the union be proper and legitimate, which we assume to be true, in a general sense, with respect to the Union here in question. *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 439. The cardinal error of defendants' position lies

in the assumption that the right is so absolute that it
may be exercised under any circumstances and without
any qualification; whereas in truth, like other rights that
exist in civilized society, it must always be exercised with
reasonable regard for the conflicting rights of others.
*Brennan* v. *United Hatters*, 73 N. J. L. 729, 749. The
familiar maxim, *Sic utere tuo ut alienum non lædas*—
literally translated, "So use your own property as not to
injure that of another person," but by more proper in-
terpretation, "so as not to injure *the rights* of another,"
(Broom's Leg. Max., 8th ed., 289)—applies to conflicting
rights of every description. For example, where two or
more persons are entitled to use the same road or passage,
each one in using it is under a duty to exercise care not to
interfere with its use by the others, or to damage them
while they are using it. And a most familiar application
is the action for enticing an employee, in which it never
was a justification that defendant wished to retain for
himself the services of the employee. 1 Black. Com.
429; 3 *Id.* 142.

Now, assuming defendants were exercising, through
Hughes, the right to invite men to join their Union, still
they had plain notice that plaintiff's mine was run "non-
union," that none of the men had a right to remain at
work there after joining the Union, and that the observ-
ance of this agreement was of great importance and value
both to plaintiff and to its men who had voluntarily
made the agreement and desired to continue working
under it. Yet defendants, far from exercising any care
to refrain from unnecessarily injuring plaintiff, deliber-
ately and advisedly selected that method of enlarging
their membership which would inflict the greatest injury
upon plaintiff and its loyal employees. Every Hitch-
man miner who joined Hughes' "secret order" and per-
mitted his name to be entered upon Hughes' list was
guilty of a breach of his contract of employment and

acted a lie whenever thereafter he entered plaintiff's
mine to work. Hughes not only connived at this, but
must be deemed to have caused and procured it, for it
was the main feature of defendants' plan, the *sine qua
non* of their programme. Evidently it was deemed to
be necessary, in order to "organize the Panhandle by a
strike movement," that at the Hitchman, for example,
man after man should be persuaded to join the Union,
and having done so to remain at work, keeping the em-
ployer in ignorance of their number and identity, until
so many had joined that by stopping work in a body they
could coerce the employer and the remaining miners to
"organize the mine," that is, to make an agreement
that none but members of the Union should be employed,
that terms of employment should be determined by ne-
gotiation not with the employees but with union officers—
perhaps residents of other States and employees of com-
peting mines—and that all questions in controversy be-
tween the mine operator and the miners should likewise
be settled with outsiders.

True, it is suggested that under the existing contract
an employee was not called upon to leave plaintiff's em-
ploy until he actually joined the Union, and that the
evidence shows only an attempt by Hughes to induce
the men to *agree* to join, but no attempt to induce them
to violate their contract by failing to withdraw from
plaintiff's employment after *actually joining*. But in a
court of equity, which looks to the substance and essence
of things and disregards matters of form and technical
nicety, it is sufficient to say that to induce men to *agree*
to join is but a mode of inducing them to join, and that
when defendants "had sixty men who had signed up or
agreed to join the organization at Hitchman," and were
"going to shut the mine down as soon as they got a few
more men," the sixty were for practical purposes, and
therefore in the sight of equity, already members of the

Union, and it needed no formal ritual or taking of an oath
to constitute them such; their uniting with the Union in
the plan to subvert the system of employment at the
Hitchman mine, to which they had voluntarily agreed
and upon which their employer and their fellow employees
were relying, was sufficient.

But the facts render it plain that what the defendants
were endeavoring to do at the Hitchman mine and neigh-
boring mines cannot be treated as a *bona fide* effort to
enlarge the membership of the Union. There is no evi-
dence to show, nor can it be inferred, that defendants
intended or desired to have the men at these mines join the
Union, *unless they could organize the mines.* Without this,
the new members would be added to the number of men
competing for jobs in the organized districts, while non-
union men would take their places in the Panhandle mines.
Except as a means to the end of compelling the owners of
these mines to change their method of operation, the de-
fendants were not seeking to enlarge the union membership.

In any aspect of the matter, it cannot be said that
defendants were pursuing their object by *lawful* means.
The question of their intentions—of their *bona fides*—
cannot be ignored. It enters into the question of malice.
As Bowen, L. J., justly said, in the *Mogul Steamship Case,*
23 Q. B. Div. 613, "Intentionally to do that which is
calculated in the ordinary course of events to damage,
and which does, in fact, damage another in that other
person's property or trade, is actionable if done without
just cause or excuse." And the intentional infliction of
such damage upon another, without justification or excuse,
is malicious in law. *Bitterman* v. *Louisville & Nashville
R. R. Co.,* 207 U. S. 205, 223; *Brennan* v. *United Hatters,*
73 N. J. L. 729, 744 *et seq.,* and cases cited. Of course,
in a court of equity, when passing upon the right of in-
junction, damage threatened, irremediable by action at
law, is equivalent to damage done. And we cannot deem

the proffered excuse to be a "*just* cause or excuse," where it is based, as in this case, upon an assertion of conflicting rights that are sought to be attained by unfair methods, and for the very purpose of interfering with plaintiff's rights, of which defendants have full notice.

Another fundamental error in defendants' position consists in the assumption that all measures that may be resorted to are lawful if they are "peaceable"—that is, if they stop short of physical violence, or coercion through fear of it. In our opinion, any violation of plaintiff's legal rights contrived by defendants for the purpose of inflicting damage, or having that as its necessary effect, is as plainly inhibited by the law as if it involved a breach of the peace. A combination to procure concerted breaches of contract by plaintiff's employees constitutes such a violation. *Flaccus* v. *Smith*, 199 Pa. St. 128; 54 L. R. A. 640; *South Wales Miners' Federation* v. *Glamorgan Coal Co.*, [1905] A. C. 239, 244, 250, 253; *Jonas Glass Co.* v. *Glass Bottle Blowers Association*, 77 N. J. Eq. 219, 223.

The present is not a case of merely withholding from an employer an economic need—as a supply of labor—until he assents to be governed by union regulations. Defendants have no supply of labor of which plaintiff stands in need. By the statement of defendant Lewis himself, made in his formal report to the Indianapolis convention of 1907, out of more than 370,000 coal miners in the States of Pennsylvania, Maryland, Virginia, and West Virginia, less than 80,000 (about 22 per cent.) were members of the Union. Considering the Panhandle separately, doubtless the proportion was even smaller, and the supply of non-union labor ample. There is no reason to doubt that if defendants had been actuated by a genuine desire to increase the membership of the Union without unnecessary injury to the known rights of plaintiff, they would have permitted their proselytes to withdraw from plaintiff's employ when and as they became

affiliated with the Union—as their contract of employment required them to do—and that in this event plaintiff would have been able to secure an adequate supply of non-union men to take their places. It was with knowledge of this, and because of it, that defendants, through Hughes as their agent, caused the new members to remain at work in plaintiff's mine until a sufficient number of men should be persuaded to join so as to bring about a strike and render it difficult if not practically impossible for plaintiff to continue to exercise its undoubted legal and constitutional right to run its mine "non-union."

It was one thing for plaintiff to find, from time to time, comparatively small numbers of men to take vacant places in a going mine, another and a much more difficult thing to find a complete gang of new men to start up a mine shut down by a strike, when there might be a reasonable apprehension of violence at the hands of the strikers and their sympathizers. The disordered condition of a mining town in time of strike is matter of common knowledge. It was this kind of intimidation, as well as that resulting from the large organized membership of the Union, that defendants sought to exert upon plaintiff, and it renders pertinent what was said by this court in the *Gompers Case* (221 U. S. 418, 439), immediately following the recognition of the right to form labor unions: "But the very fact that it is lawful to form these bodies, with multitudes of members, means that they have thereby acquired a vast power, in the presence of which the individual may be helpless. This power, when unlawfully used against one, cannot be met, except by his purchasing peace at the cost of submitting to terms which involve the sacrifice of rights protected by the Constitution; or by standing on such rights and appealing to the preventive powers of a court of equity. When such appeal is made it is the duty of government to protect the one against the many as well as the many against the one."

Defendants' acts cannot be justified by any analogy to competition in trade. They are not competitors of plaintiff; and if they were their conduct exceeds the bounds of fair trade. Certainly, if a competing trader should endeavor to draw custom from his rival, not by offering better or cheaper goods, employing more competent salesmen, or displaying more attractive advertisements, but by persuading the rival's clerks to desert him under circumstances rendering it difficult or embarrassing for him to fill their places, any court of equity would grant an injunction to restrain this as unfair competition.

Upon all the facts, we are constrained to hold that the purpose entertained by defendants to bring about a strike at plaintiff's mine in order to compel plaintiff, through fear of financial loss, to consent to the unionization of the mine as the lesser evil, was an unlawful purpose, and that the methods resorted to by Hughes— the inducing of employees to unite with the Union in an effort to subvert the system of employment at the mine by concerted breaches of the contracts of employment known to be in force there, not to mention misrepresentation, deceptive statements, and threats of pecuniary loss communicated by Hughes to the men—were unlawful and malicious methods, and not to be justified as a fair exercise of the right to increase the membership of the Union.

There can be no question that plaintiff was threatened with danger of an immediate strike as a result of the activities of Hughes. The effect of his arguments and representations is not to be judged from the testimony of those witnesses who rejected his overtures. Naturally, it was not easy for plaintiff to find men who would testify that they had agreed with Hughes to break their contract with plaintiff. One such did testify. But the true measure of the extent of his operations and the probability of his carrying them to success are indicated by his

declaration to Myers that he had about enough names at the Hitchman to "crack off," by the statement to McKinley that twenty-four men at the Glendale mine had joined the organization, and sixty at the Hitchman, and by the fact that they actually succeeded in shutting down the Richland about the middle of October. The declaration made concerning the Glendale is corroborated by the evidence of what happened at that mine.

That the damage resulting from a strike would be irremediable at law is too plain for discussion.

Therefore, upon the undisputed facts of the case, and the indubitable inferences from them, plaintiff is entitled to relief by injunction. Having become convinced by three costly strikes, occurring within a period of as many years, of the futility of attempting to operate under a closed-shop agreement with the Union, it established the mine on a non-union basis, with the unanimous approval of its employees—in fact upon their suggestion—and under a mutual agreement, assented to by every employee, that plaintiff would continue to run its mine non-union and would not recognize the United Mine Workers of America; that if any man wanted to become a member of that Union he was at liberty to do so, but he could not be a member and remain in plaintiff's employ. Under that agreement plaintiff ran its mine for a year and more, and, so far as appears, without the slighest disagreement between it and its men, and without any grievance on their part. Thereupon defendants, having full notice of the working agreement between plaintiff and its men, and acting without any agency for those men, but as representatives of an organization of mine workers in other States, and in order to subject plaintiff to such participation by the Union in the management of the mine as necessarily results from the making of a closed-shop agreement, sent their agent to the mine, who, with full notice of, and for the very purpose of subverting,

the status arising from plaintiff's working agreement and subjecting the mine to the Union control, proceeded, without physical violence, indeed, but by persuasion accompanied with threats of a reduction of wages and deceptive statements as to the attitude of the mine management, to induce plaintiff's employees to join the Union and at the same time to break their agreement with plaintiff by remaining in its employ after joining; and this for the purpose not of enlarging the membership of the Union, but of coercing plaintiff, through a strike or the threat of one, into recognition of the Union.

As against the answering defendants, plaintiff's right to an injunction is clear; as to the others named as defendants, but not served with process, the decree is erroneous, as already stated.

Respecting the sweep of the injunction, we differ somewhat from the result reached by the District Court.

So far as it restrains—(1) Interfering or attempting to interfere with plaintiff's employees for the purpose of unionizing plaintiff's mine without its consent, by representing or causing to be represented to any of plaintiff's employees, or to any person who might become an employee of plaintiff, that such person will suffer or is likely to suffer some loss or trouble in continuing in or in entering the employment of plaintiff, by reason of plaintiff not recognizing the Union, or because plaintiff runs a nonunion mine; (2) Interfering or attempting to interfere with plaintiff's employees for the purpose of unionizing the mine without plaintiff's consent, and in aid of such purpose knowingly and wilfully bringing about the breaking by plaintiff's employees of contracts of service known at the time to exist with plaintiff's present and future employees; (3) Knowingly and wilfully enticing plaintiff's employees, present or future, to leave plaintiff's service on the ground that plaintiff does not recognize the United Mine Workers of America or runs a non-union mine,

etc.; (4) Interfering or attempting to interfere with plaintiff's employees so as knowingly and wilfully to bring about the breaking by plaintiff's employees, present and future, of their contracts of service, known to the defendants to exist, and especially from knowingly and wilfully enticing such employees, present or future, to leave plaintiff's service without plaintiff's consent; (5) Trespassing on or entering upon the grounds and premises of plaintiff or its mine for the purpose of interfering therewith or hindering or obstructing its business, or with the purpose of compelling or inducing, by threats, intimidation, violent or abusive language, or persuasion, any of plaintiff's employees to refuse or fail to perform their duties as such; and (6) Compelling or inducing or attempting to compel or induce, by threats, intimidation, or abusive or violent language, any of plaintiff's employees to leave its service or fail or refuse to perform their duties as such employees, or compelling or attempting to compel by like means any person desiring to seek employment in plaintiff's mine and works from so accepting employment therein;—the decree is fully supported by the proofs. But it goes further, and awards an injunction against picketing and against acts of physical violence, and we find no evidence that either of these forms of interference was threatened. The decree should be modified by eliminating picketing and physical violence from the sweep of the injunction, but without prejudice to plaintiff's right to obtain an injunction hereafter against these forms of interference if proof shall be produced, either in proceedings supplemental to this action or in an independent action, that such an injunction is needed.

*The decree of the Circuit Court of Appeals is reversed, and the decree of the District Court is modified as above stated, and as so modified it is affirmed, and the cause is remanded to the District Court for further proceedings in conformity with this opinion.*

MR. JUSTICE BRANDEIS, dissenting.

This suit was begun October 24, 1907.  The Hitchman Coal & Coke Company, plaintiff below, is the owner of a coal mine in West Virginia.   John Mitchell and nine others, defendants below, were then the chief executive officers of the United Mine Workers of America and of its district and sub-district organizations having "jurisdiction" over the territory in which plaintiff's mine is situated; and were sued both individually and as such officers.   The mine had been "unionized" about three years prior to April 16th, 1906; and until about that date was operated as a "union" mine, under a collective agreement with a local union of the United Mine Workers of America.   Then a strike was declared by the union; and a short shut-down followed.   While the strike so declared was still in force, as the bill alleges, the company re-opened the mine as a closed non-union mine.   Thereafter persons applying for work were required as a condition of obtaining employment to agree that they would not, while in the service of the company, be a member of the union, and if they joined the union would withdraw from the company's employ.[1]

---

[1] About two months *after* the restraining order was issued in this case the plaintiff company began the practice of requiring applicants for work to sign employment cards, in the following terms:

"I am employed by and work for the Hitchman Coal & Coke Company with the express understanding that I am not a member of the United Mine Workers of America, and will not become so while an employee of the Hitchman Coal & Coke Company; that the Hitchman Coal & Coke Company is run non-union and agrees with me that it will run non-union while I am in its employ.   If at any time I am employed by the Hitchman Coal & Coke Company I want to become connected with the United Mine Workers of America, or any affiliated organization, I agree to withdraw from the employment of said company, and agree that while I am in the employ of that company I will not make any efforts amongst its employees to bring about the union-

Alleging that efforts were being made illegally to unionize its mine "without its consent," the company brought in the United States Circuit (now District) Court for the Northern District of West Virginia this suit to enjoin such efforts. District Judge Dayton granted a restraining order upon the filing of the bill. An order was entered May 26, 1908, continuing it as a temporary injunction. A motion to modify the same was denied, September 21, 1909. 172 Fed. Rep. 963. An appeal from this order was dismissed by the Circuit Court of Appeals, March 11, 1910. 176 Fed. Rep. 549. The case was then heard on the merits; defendants having denied in their answer all the charges of unlawful conduct set forth in the bill; and on January 18, 1913, a decree was entered for a perpetual injunction substantially in the form of the restraining order. 202 Fed. Rep. 512. This decree was reversed by the Circuit Court of Appeals on June 1, 1914 (214 Fed. Rep. 685); but a stay was granted pending an application to this court for a writ of certiorari. The company appealed to this court and also applied for a writ of certiorari. The appeal was dismissed, as the jurisdiction of

---

izing of that mine against the company's wish. I have either read the above or heard the same read."

Prior to that time, the agreement rested in oral understanding merely, and is sufficiently indicated in the following excerpts from the testimony of the mine superintendent as to what he told the men applying for employment:

"I also told them that any man who wanted to become a member of the United Mine Workers—that that was his business—but he could not be a member of the United Mine Workers and be affiliated with the United Mine Workers and be under the employ of the Hitchman Coal & Coke Company, or be under the jurisdiction of the United Mine Workers; that the mine was run non-union so far as the United Mine Workers of America were concerned.

"Q. You mean you made every man understand that while he worked for the Hitchman Company he must keep out of the union?

"A. Yes, sir; or at least they said they understood it."

the Circuit (District) Court was rested wholly upon diversity of citizenship, plaintiff being a corporation organized under the laws of West Virginia and all the defendants citizens and residents of other States. 241 U. S. 644. A writ of certiorari was granted, however, March 13, 1916. The case was argued at that term and a reargument was ordered.

The District Court held that the United Mine Workers of America with its subordinate branches constitutes an unlawful organization—illegal both under the law of West Virginia and under the Federal Anti-Trust Act; that its long continued effort to unionize the mines of West Virginia had not been "in the interest either of the betterment of mine labor in the State or of upholding that free commerce in coal between the States guaranteed by Federal law," but to restrain if not destroy it for the benefit of "rival operators and producers in Ohio, Western Pennsylvania, Illinois, and Indiana, competitive fields" in which the mines had been unionized; and that "in pursuit of its unlawful purposes" the union "have sought and still seek to compel the plaintiff . . . to submit to contractual relations with it as an organization relating to the employment of labor and production contrary to the will and wish of said company; that its officers, in pursuance of such unlawful effort to monopolize labor and restrain trade, and with knowledge of the express contracts existing between this plaintiff and its employees, have unlawfully sought to cause the breach of the said contracts on the part of its said employees."

The decree, besides the usual injunction against threat, intimidation, force or violence, and against inducing breaches of employees' contracts or trespassing upon plaintiff's property, enjoined defendants (and others hereinafter described), among other things, from—

1. "Representing ["for the purpose of unionizing plaintiff's mine without plaintiff's consent"] . . . to

any of plaintiff's employees, or to any person who might become an employee of plaintiff, that such person . . . is likely to suffer some loss or trouble in continuing in or in entering the employment of plaintiff, . . . representing . . . to such employee . . . that such loss or trouble . . . may come by reason of plaintiff not recognizing the United Mine Workers of America, or because plaintiff runs a non-union mine."

2. " . . . knowingly and wilfully enticing ["for the purpose of unionizing plaintiff's mine without plaintiff's consent"] plaintiff's employees, present or future, . . . to leave plaintiff's service, giving or assigning . . . as a reason for . . . leaving of plaintiff's service, that plaintiff does not recognize the United Mine Workers of America, or that plaintiff runs a non-union mine."

3. " . . . knowingly and wilfully enticing plaintiff's employees, present or future, . . . to leave plaintiff's service, without plaintiff's consent, against plaintiff's will, and to plaintiff's injury."

4. " . . . establishing a picket . . . for the purpose of inducing . . . by . . . persuasion . . . any person . . . coming to plaintiff's mine to accept employment . . . to refuse . . . to accept service with plaintiff."

5. " . . . interfering in any manner whatsoever, either by . . . persuasion or entreaty with any person in the employ of plaintiff who has contracted with and is in the actual service of plaintiff to . . . induce him to quit the service of plaintiff . . . or assisting, or abetting in any manner" his doing so.

Three of the defendants—Mitchell, Wilson and Hughes —were never served with process and did not enter any appearance except to object to the jurisdiction of the court over them. Of the remaining seven all but two had, prior to the entry of the final decree, ceased to hold

any office either in the United Mine Workers of America or in any of the district or sub-district organizations. Nevertheless the decree directed that the injunction issue against each of the ten original defendants, "individually"; and also in their official capacities against their successors in office (who were named in the decree) although these had not been served with process or been named in the bill; the court declaring such persons to be "before the court by representation through service having been made upon their said predecessors in office, sued as such officers and as members of the United Mine Workers of America." The decree extended the injunction, among others, also to "all persons now members of said United Mine Workers of America, and all persons who though not now members do become members of said United Mine Workers of America."

The Circuit Court of Appeals, reversing the decree of the District Court, held that the United Mine Workers of America was not an unlawful organization under the laws of West Virginia, that its validity under the Federal Anti-Trust Act could not be considered in this proceeding; that so long as defendants "refrained from resorting to unlawful measures to effectuate" their purpose "they could not be said to be engaged in a conspiracy to unionize plaintiff's mine"; that "the evidence fails to show that any unlawful methods were resorted to by these defendants in this instance"; and specifically that there was nothing in the individual contracts which barred defendants from inducing the employees to join the union. With these conclusions I agree substantially.

*First*: *The alleged illegality of the United Mine Workers of America under the law of West Virginia.*

The United Mine Workers of America does not appear to differ essentially in character and purpose from other international unions which, like it, are affiliated with the American Federation of Labor. Its membership is said

to be larger than that of any other; and it may be more powerful. But the common law does not limit the size of unions or the degree to which individual workmen may by union increase their bargaining power. As stated in *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 439: "The law, therefore, recognizes the right of workingmen to unite and to invite others to join their ranks, thereby making available the strength, influence and power that come from such association." We do not find either in the decisions or the statutes of West Virginia anything inconsistent with the law as declared by this court. The union is not an unlawful organization, and is not in itself an unlawful conspiracy. We have no occasion to consider the legality of the specific provisions contained in its constitution or by-laws.

*Second: The alleged illegality of the United Mine Workers of America under the Federal Anti-Trust Act.*

The District Judge undertook to pass upon the legality of the United Mine Workers of America under the Federal Anti-Trust Act; but the question was not in issue in the case. It had not been raised in the bill or by answer. Evidence bearing upon the issue was properly objected to by defendants and should have been excluded.

*Third: The alleged conspiracy against the West Virginia Mines.*

It was doubtless the desire of the United Mine Workers to unionize every mine on the American continent and especially those in West Virginia which compete directly with the mines of Western Pennsylvania, Ohio, Indiana, and other States already unionized. That desire and the purpose to effect it were not unlawful. They were part of a reasonable effort to improve the condition of workingmen engaged in the industry by strengthening their bargaining power through unions; and extending the field of union power. No conspiracy to shut down or otherwise injure West Virginia was proved, nor was there

any averment in the bill of such conspiracy, or any issue otherwise raised by the pleadings which justified the consideration of that question by the District Court.[1]

*Fourth:* "*Unionizing plaintiff's mine without plaintiff's consent.*"

The fundamental prohibition of the injunction is against acts done "for the purpose of unionizing plaintiff's mine without plaintiff's consent." Unionizing a shop does not mean inducing the employees to become members of the union.[2] It means inducing the employer

---

[1] This alleged conspiracy not being in issue, the District Court improperly allowed the introduction of, and considered, a mass of documents referring to various mine workers' conventions, and joint conventions of miners and operators held years previous to the filing of the bill. Judge Dayton laid great stress on reported declarations of the delegates to these conventions, although the declarations of alleged co-conspirators were obviously inadmissible, there being no foundation for the conspiracy charge.

[2] A witness for the defendants testified as follows:

"There is a difference between unionizing a mine and unionizing the employees in a mine; unionizing the employees is having the men join the organization; unionizing a mine is creating joint relations between the employers and employees; a mine cannot be unionized unless the employer enters into contractual relations with the union; it is not the policy or purpose of the United Mine Workers as an organization to coerce a man into doing a thing against his will; this distinction between unionizing a mine and unionizing the employees of a mine has existed since the organization came about, and this method of unionizing a mine existed in 1906 and 1907."

A witness for the plaintiff testified that "the term 'union,' when applied to mining, means the United Mine Workers, and a union mine is a mine that is under their jurisdiction and so recognized . . ." The contrary is "non-union or open shop." And further, "The men might be unionized at a mine and the mine owners not recognize the union. That would in effect be an open shop. When I said 'unionize the employees' I meant practically all of the employees; but a union mine, as I understand it, is one wherein the closed shop is practically enforced." In such case, the witness explained, the operator would be practically in contract relation with the organization.

It was also testified: "The difference between organizing the men at

to enter into a collective agreement with the union governing the relations of the employer to the employees. Unionizing implies, therefore, at least *formal* consent of the employer. Both plaintiff and defendants insisted upon exercising the right to secure contracts for a closed shop. The plaintiff sought to secure the *closed non-union shop* through individual agreements with employees. The defendants sought to secure the *closed union shop* through a collective agreement with the union. Since collective bargaining is legal, the fact that the workingmen's agreement is made not by individuals directly with the employer, but by the employees with the union and by it, on their behalf, with the employer, is of no significance in this connection. The end being *lawful*, defendant's efforts to unionize the mine can be illegal, only if the methods or means pursued were unlawful; unless indeed there is some special significance in the expression "unionizing without plaintiff's consent."

It is urged that a union agreement curtails the liberty of the operator. Every agreement curtails the liberty of those who enter into it. The test of legality is not whether an agreement curtails liberty, but whether the parties have agreed upon some thing which the law prohibits or declares otherwise to be inconsistent with the public welfare. The operator by the union agreement

---

the mine and organizing the mine is that when the miners are organized the work of organizing the mine is only just started. They next proceed to meet with the operator who owns the mine, or operates it, for the purpose of making contracts or agreements. Under the constitution and methods of the United Mine Workers a mine cannot be organized without the consent of the owner, and it is not the object or purpose of the United Mine Workers to do so, and never has been; it has never been attempted as far as witness knows. After a mine has been organized, the agreement between the employer and the organization is paramount. The constitution of the organization has nothing to do with the workings afterwards; that agreement does not take away from the operator the control of his men."

binds himself: (1) to employ only members of the union; (2) to negotiate with union officers instead of with employees individually the scale of wages and the hours of work; (3) to treat with the duly constituted representatives of the union to settle disputes concerning the discharge of men and other controversies arising out of the employment. These are the chief features of a "unionizing" by which the employer's liberty is curtailed. Each of them is legal. To obtain any of them or all of them men may lawfully strive and even strike. And, if the union may legally strike to obtain each of the things for which the agreement provides, why may it not strike or use equivalent economic pressure to secure an agreement to provide them?

It is also urged that defendants are seeking to "coerce" plaintiff to "unionize" its mine. But coercion, in a legal sense, is not exerted when a union merely endeavors to induce employees to join a union with the intention thereafter to order a strike unless the employer consents to unionize his shop. Such pressure is not coercion in a legal sense. The employer is free either to accept the agreement or the disadvantage. Indeed, the plaintiff's whole case is rested upon agreements secured under similar pressure of economic necessity or disadvantage. If it is coercion to threaten to strike unless plaintiff consents to a closed union shop, it is coercion also to threaten not to give one employment unless the applicant will consent to a closed non-union shop. The employer may sign the union agreement for fear that *labor* may not be otherwise obtainable; the workman may sign the individual agreement for fear that *employment* may not be otherwise obtainable. But such fear does not imply coercion in a legal sense.

In other words an employer, in order to effectuate the closing of his shop to *union* labor, may exact an agreement to that effect from his employees. The agreement

itself being a lawful one, the employer may withhold from the men an economic need—employment—until they assent to make it. Likewise an agreement closing a shop to *non-union* labor being lawful, the union may withhold from an employer an economic need—labor—until he assents to make it. In a legal sense an agreement entered into, under such circumstances, is voluntarily entered into; and as the agreement is in itself legal, no reason appears why the general rule that a legal end may be pursued by legal means should not be applied. Or, putting it in other words, there is nothing in the character of the agreement which should make *unlawful* means used to attain it, which in other connections are recognized as *lawful*.

*Fifth: There was no attempt to induce employees to violate their contracts.*

The contract created an employment at will; and the employee was free to leave at any time. The contract did not bind the employee *not* to join the union; and he was free to join it at any time. The contract merely bound him to withdraw from plaintiff's employ, if he joined the union. There is evidence of an attempt to induce plaintiff's employees to *agree* to join the union; but none whatever of any attempt to induce them to violate their contract. Until an employee actually joined the union he was not, under the contract, called upon to leave plaintiff's employ. There consequently would be no breach of contract until the employee both joined the union *and* failed to withdraw from plaintiff's employ. There was no evidence that any employee was persuaded to do that or that such a course was contemplated. What perhaps was intended was to secure agreements or assurances from individual employees that they would join the union when a large number of them should have consented to do so; with the purpose, when such time arrived, to have them join the union

together and strike—unless plaintiff consented to unionize the mine. Such a course would have been clearly permissible under the contract.

*Sixth: Merely persuading employees to leave plaintiff's employ or others not to enter it was not unlawful.*

To induce third persons to leave an employment is actionable if done maliciously and without justifiable cause although such persons are free to leave at their own will. *Truax* v. *Raich*, 239 U. S. 33, 38; *Thacker Coal Co.* v. *Burke*, 59 W. Va. 253. It is equally actionable so to induce others not to enter the service. The individual contracts of plaintiff with its employees added nothing to its right in this connection, since the employment was terminable at will.

As persuasion, considered merely as a means, is clearly legal, defendants were within their rights if, and only if, their interference with the relation of plaintiff to its employees was for justifiable cause. The purpose of interfering was confessedly in order to strengthen the union, in the belief that thereby the condition of workmen engaged in mining would be improved; the bargaining power of the individual workingman was to be strengthened by collective bargaining; and collective bargaining was to be ensured by obtaining the union agreement. It should not, at this day, be doubted that to induce workingmen to leave or not to enter an employment in order to advance such a purpose is justifiable when the workmen are not bound by contract to remain in such employment.

*Seventh: There was no "threat, violence or intimidation."*

The decree enjoined "threats, violence or intimidation." Such action would, of course, be unlawful though employed in a justifiable cause. But there is no evidence that any of the defendants have resorted to such means. The propaganda among plaintiff's employees was conducted almost entirely by one man, the defendant Hughes, a District No. 6 organizer. His actions were orderly and

peaceable, consisting of informal talks with the men, and a few quietly conducted public meetings,[1] in which he argued the benefits of organization and pointed out to the men that, although the company was then paying them according to the union scale, there would be nothing to prevent a later reduction of wages unless the men united. He also urged upon the men that if they lost their present jobs, membership in the union was requisite to obtaining employment in the union mines of the neighboring States. But there is no suggestion that he exceeded the moderate bounds of peaceful persuasion, and indeed, if plaintiff's witnesses are to be believed, men with whom Hughes had talked, his argument made no impression on them, and they expressed to him their satisfaction with existing conditions at the mine.

When this suit was filed no right of the plaintiff had been infringed and there was no reasonable ground to believe that any of its rights would be interfered with; and, in my opinion, the Circuit Court of Appeals properly reversed the decree of the District Court, and directed that the bill be dismissed.

MR. JUSTICE HOLMES and MR. JUSTICE CLARKE concur in this dissent.

---

[1] Following is a notice of one of Hughes' meetings which was torn from a telegraph pole in the street by the plaintiff's mine superintendent:

"Notice to the miners of the Hitchman mine. There will be a mass meeting Friday evening at 6.30 P. M. at Nick Heil's Base Ball Grounds, for the purpose of discussing the principals of organization. President William Green will be present. All miners are cordially invited to attend."