**GASAWAY et al. v. BORDERLAND COAL CORPORATION.**

(Circuit Court of Appeals, Seventh Circuit. December 15, 1921.)

No. 3059.

1. **Appeal and error ⚮954(1)—Grant of interlocutory injunction not disturbed, in absence of improvident exercise of discretion.**

   Where bill seeking an injunction states a good cause of action, the Circuit Court of Appeals, on appeal from decree granting an interlocutory injunction, will not disturb the decree, unless it clearly discloses an improvident exercise of judicial discretion.

2. **Appeal and error ⚮837(3)—Findings based on complaint conclusive on appeal from decree granting interlocutory injunction.**

   On appeal from decree granting an interlocutory injunction, the Circuit Court of Appeals accepts as conclusive the District Court's find-

ings of fact based on the plaintiff's verified bill and affidavits, and ignores the issues of fact which may be tendered in the answer to be filed, and which are forecast to some degree in the affidavits filed on behalf of defendants.

**3. Injunction ⬅152—Considerations in measuring justifiable scope of interlocutory decree stated.**

In measuring the justifiable scope of interlocutory decree, the court will consider the nature and object of the bill, the property that requires protection, the interest of parties in that property, and will ascertain what decree is indispensable, in view of the respective rights of the parties in the suit, to afford complete protection.

**4. Injunction ⬅1—Is an extraordinary remedy, limited to protection of property from unlawful invasion.**

Injunction is an extraordinary remedy, and is limited to the protection of property from unlawful invasion.

**5. Injunction ⬅135—Great care should be exercised in ascertaining necessity for preliminary injunction.**

A preliminary injunction is necessarily so drastic in its nature that great care should be had in exercising the discretion.

**6. Injunction ⬅157, 189—Should forbid only the particular unlawful invasions that would be committed, except for such restraint.**

No injunction, preliminary or final, should forbid more than the particular unlawful invasions which the court finds would be committed, except for the restraint imposed.

**7. Injunction ⬅157—Interlocutory decree erroneously applied to unnamed parties, on whose behalf plaintiff alleged to have filed bill.**

In action by coal mine operator, who alleged that it filed its bill on behalf of itself and 62 other operators of closed nonunion mines in certain district, to enjoin operators of unionized mines in other district and miners' organization from destroying the property, disturbing the employees, and interfering with the business of the closed nonunion mine operators, in which plaintiff did not name the 62 other operators, and did not allege why it was impracticable to name or to enjoin such other operators, the court, in granting interlocutory injunction, should have made such decree applicable merely to the plaintiff, and not to such other unnamed operators.

**8. Injunction ⬅136(3)—Interlocutory decree granted to restrain destruction of property, interference with employees, and threatened trespasses upon plaintiff's property rights.**

In action by operator of nonunion coal mine, doing an interstate business, against operators of unionized mines in other district and mine workers' organization, where the bill and affidavits show such defendants, pursuant to conspiracy, to be engaged in destroying its property, interfering with and intimidating its officers, agents, and employees by armed forces, assaults, threats, and abusive language, and by intrusion on their privacy without invitation or consent, and in inducing plaintiff's employees secretly to change from nonunion to union men, and to remain in plaintiff's employment in violation of their contracts, the District Court will grant a preliminary injunction prohibiting such unlawful acts, and will restrain other specifically threatened trespasses on plaintiff's property rights, if any are shown.

**9 Injunction ⬅101(1)—Employers and employees may bargain collectively for a closed nonunion shop, or for a closed union shop.**

Unions of owners of capital may bargain collectively through their officers with laborers, either individually or collectively for a closed nonunion shop, and unions of laborers may bargain collectively through their officers with employers, either individually or collectively, for a closed union shop, and both are entitled to free and equal access to the

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

pool of unemployed labor, for the purpose of securing recruits by peaceable appeals to reason.

**10. Injunction ⬯101(1)—Employers may persuade union men to become nonunion, and union laborers may persuade nonunion men to become union.**

Employers may persuade a union man, provided they do not violate his right of privacy, nor invade the rights of another, to become nonunion, and union laborers may under the same conditions persuade a nonunion man to become union.

**11. Injunction ⬯157—Restraining unionization of nonunion man held erroneous, in that it prohibited peaceful persuasion.**

Preliminary injunction *held* erroneous, in that it deprived union laborers of the right to persuade nonunion employees of plaintiff to join the union, instead of limiting the prohibition of unionization or attempted unionization of plaintiff's men to the threatened direct and immediate interfering acts shown by the bill and affidavits.

**12. Injunction ⬯157—Sending of money into mine district for unionization of miners should not be restrained, except in so far as money is used in protecting unlawful acts.**

In action for injunction against operators of unionized mines and organization of union workers, alleged to be destroying plaintiff's property and interfering with its employees by threats, intimidation, etc., an interlocutory injunction restraining the sending of money into the district in which plaintiff's mine was located, to be used in unionizing workers therein, should have limited the prohibition to the use of the money in aiding or promoting the unlawful acts alleged.

**13. Injunction ⬯157—Interlocutory decree held erroneous, in so far as it restrained performance of check-off contracts between operators of unionized mines and the organization of workers.**

Interlocutory injunction *held* erroneous, in so far as it restrained the performance of check-off contracts between such operators of union mines and union organizations, whereby operators deducted fees of union workers and made payment direct to the organizations.

Appeal from the District Court of the United States for the District of Indiana.

Suit by the Borderland Coal Corporation against Ora Gasaway, W. D. Van Horn, and others. From a decree granting a temporary injunction (275 Fed. 871), the named defendants appeal. Remanded, with directions.

William A. Glasgow, Jr., of Philadelphia, Pa., for appellants.

Z. T. Vinson, of Huntington, W. Va., and A. M. Belcher, of Charleston, W. Va., for appellee.

Before BAKER, ALSCHULER, and PAGE, Circuit Judges.

BAKER, Circuit Judge. The general nature of the case is stated in the opinion filed by the District Judge:

"The bill avers and the proof shows a combination and working arrangement—a conspiracy—between the United Mine Workers of America and the coal operators in the so-called 'Central competitive field,' to destroy what some of the conspirators call the 'vicious competition' of the West Virginia mines.

"Almost all of the coal produced in West Virginia is shipped out of the state in interstate commerce, and the business of the plaintiff is shown to be interstate. It lifts its coal out of its mines in one state and places it upon cars

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

for shipment in another. The evidence shows that the competition complained of, and sought to be destroyed, is competition in the sale of bituminous coal throughout the several states. A conspiracy to destroy such competition is in direct contravention of the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830). Section 1 of that act provides:

" 'Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal.'

"The bituminous coal fields of the United States are already unionized, except a portion of West Virginia and a small section of the Southwestern part of the country, and an effort to unionize the West Virginia mines is part of an effort to monopolize all the coal industry in the United States until, as one of the conspirators says, the United Mine Workers' organization 'shall cover every coal-producing state in the republic.'

"The method agreed upon and adopted by the conspirators to thus destroy competition was to organize or unionize the West Virginia field. These West Virginia operators desire to run their mines on a nonunion basis. The effort on the part of the defendants to unionize these mines, and thus compel the operators to unwillingly run upon the union basis, would result either in the suppression of this nonunion mining altogether, or would put such restrictions on it as to accomplish the objects of the conspiracy, namely, raise the price of the West Virginia product, so that it could not compete with the so-called 'Central competitive field.' The attempt to do this was continued for some time by the usual incidents of violence and exhibitions of force, and matters progressed until a state of war existed in West Virginia, which the state government was unable to put down, and upon the call of the state authorities the President of the United States declared martial law, sent federal troops into West Virginia, and restored order.

"The evidence shows that members of the Mine Workers' Union purchased firearms and ammunition and otherwise financed the violent activities in behalf of the unionizing forces in West Virginia, and this state of war continued until the President sent troops into the state, and it is only held in abeyance because of that fact.

"The evidence shows that the revenues of the Mine Workers' Union are produced from dues and assessments laid upon the members; that these fines and assessments are by an arrangement between the Miners' organization and the operators, taken from the wages of the workers in the mines by the operators and paid by them to the organization of Mine Workers. This is the 'check-off' system. The membership is large and the dues and assessments yield an enormous sum.

"Statements made by officers of the United Mine Workers show that the miners' organization has sent into West Virginia to carry on this struggle more than $2,500,000, and the secretary-treasurer of that organization, in his report to the Convention recently held in this city, stated that during the year ending August 1, 1921, the organization had sent into West Virginia more than $1,000,000. This money was derived from the 'check-off' system, and was sent to West Virginia to assist in the effort to organize the West Virginia field.

"The evidence without contradiction shows that ammunition and arms were purchased by members of the Mine Workers' Union and used for the purpose of carrying on this struggle. It is claimed on the part of the defendants that the money used to purchase these arms and this ammunition and to mobilize and direct these armies came from the locals, and that no part of the money sent from here was used for that purpose, but that such money was and is used only in such peaceable ways as caring for and feeding and furnishing supplies to those union miners who have been evicted from their homes or deprived of a living, or otherwise put to a disadvantage in carrying on this struggle.

"If this be true, it is quite apparent that there is no difference in the activities of those who furnish the food and supplies for the army and those who furnish it its arms and ammunition. The money sent by the miners' organization derived from the 'check-off' system, as above stated, is sent there to

aid, abet, and assist those on the ground, actively engaged in the unlawful attempt to unionize the nonunion mines in West Virginia and destroy competition, as above stated.

"The evidence clearly shows that the mine operators know—at least they know now—that this money thus contributed by them through the 'check-off' system is used in this unlawful manner. It therefore follows that the use of such money should be enjoined, and the carrying on of the 'check-off' system as a means for raising it should likewise be enjoined.

"At the conclusion of the evidence, counsel for the miners requested time to introduce some evidence explanatory of the large sums of money shown to have been sent by the organization into the West Virginia fields, and also asked for an extension of time for 30 days in which to file their answer to the bill. The court at once conceded that these requests were reasonable, and indicated its willingness to grant such extensions, and stated that, owing to the great importance of the questions involved, and considering that, if the relief prayed for in the bill were granted, it would have such far-reaching consequences, suggested that it would like all the light upon the subject that could be furnished by evidence, and time for investigation, and argument as to the principles of law involved, and stated that the time requested by the Mine Workers' counsel would be granted, upon condition that the status quo be preserved in the meantime. Mr. John L. Lewis, the president of the United Mine Workers of America, being in the courtroom at the time, was asked by the court if he would agree to preserve the status quo—that is, cease efforts to unionize these mines in West Virginia until the court would have time to more thoroughly investigate the matter—the court stating that it would be entirely satisfied with Mr. Lewis' assurance to that effect. Mr. Lewis promptly declined to agree to desist, thus creating the emergency for the issuing of a temporary injunction, and compelling the court to act without further opportunity to investigate the important questions involved.

"This court cannot police West Virginia, nor does it hold that the United Mine Workers' Union is itself an unlawful organization, nor will it in any way attempt to curtail its lawful activities; but it can enjoin the unlawful activities of the parties here in Indiana, who are here now under the jurisdiction of this court, and a temporary injunction to that effect will be issued."

And thereupon the District Court entered the following decree:

"The plaintiff, by counsel, offered in evidence and read to the court, certain affidavits numbered from 1 to 41, and 77 to 79, inclusive, which were filed and made a part of the record, and also asked that the bill of complaint be read as an affidavit, which was done, all in support of its motion for said temporary injunction; and the defendants also offered in evidence, in resisting said motion, certain affidavits, numbered 42 to 75, inclusive, which were read, filed, and made a part of the record.

"Thereupon the defendants, by counsel, moved the court to be allowed 30 days within which to file their answers, and the court stated that, in his opinion, the evidence in the case warranted the granting of a temporary injunction in accordance with the prayer of the bill of complaint and in accordance with the notice given, at least in part, but that the case is of such importance that the request for 30 days within which to file answers would be granted, and the question of granting said temporary injunction would not be passed upon until after the filing of said answers, and after further consideration, provided John L. Lewis, president of the United Mine Workers of America, who was present in court, would state in open court, or promise the court, that his said organization, the United Mine Workers of America, would cease all effort to organize the nonunion coal fields of Mingo county, W. Va., and Pike county, Ky., pending the consideration by the court of the question whether or not said temporary injunction should be awarded; the court further stating to said Lewis, and to counsel for the defendants, that if said Lewis declined to give the assurance suggested, notwithstanding the fact that counsel for the defendant members and officials of said United Mine Workers of America have asked for 30 days' time within which to file their answers, the court

would proceed at this time to award such temporary injunction as the evidence in the case warrants.

"Thereupon said John L. Lewis, president of the United Mine Workers of America, stated in open court that he declined to give the assurance suggested by the court that said United Mine Workers of America should cease all efforts to organize the nonunion coal fields of Mingo county, W. Va., and Pike county, Ky., during said time specified by the court.

"Thereupon the court, upon consideration of the bill of complaint, the affidavits read and filed on behalf of both the plaintiff and the defendants and the circumstances hereinbefore set out, doth adjudge, order, and decree that a temporary injunction, in accordance with the prayer of the bill of complaint filed herein, be and the same is hereby awarded as follows:

"That the defendants, P. H. Penna, J. H. Seifert, and W. J. Snyder, citizens and residents of the state of Indiana, Jackson Coal & Coke Company, Queen Coal & Mining Company, Rowland Power Consolidated Colliers Company, and Lower Vein Coal Company, corporations organized under the state of Indiana and citizens and residents of said state, individually and as representatives of the class of persons made defendants in the original and amended bill of complaint filed herein, be, and they are hereby, and each of them is hereby, enjoined and restrained from collecting over and through their pay rolls, or over and through the pay rolls of either of them, or in any other manner, any and all moneys as dues and assessments levied or charged by the said United Mine Workers of America, its officials or members, upon or against its members, employés of said individuals and of said defendant corporations, or who may hereafter be employed by them, or either of them, under the check-off provisions of the contracts in evidence herein, and heretofore executed by, or on behalf of, said named defendants and the officials or members of said United Mine Workers of America, or under any and all contract or contracts that may hereafter be executed between the said defendants and the officials or members of the said United Mine Workers of America, and from paying the same to the officials, members or representatives of said United Mine Workers of America.

"That the defendants Ora Gasaway and W. D. Van Horn, citizens and residents of the state of Indiana, individually and as members of the International Executive Board of said United Mine Workers of America, and their respective successors in office, and their committees, agents, servants, confederates, and associates, and all the other officials, representatives, members, agents, attorneys, and servants of said United Mine Workers of America and all persons who now are, or hereafter may be, members of said United Mine Workers of America, and all persons combining, confederating, or conspiring with the said designated persons, and all other persons whomsoever, and each and every one of them, be and they are hereby enjoined and restrained:

"From advising, assisting, encouraging, aiding, abetting, or in any way or manner, and by any and all means whatsoever by the use of any funds or moneys howsoever collected by the International Union, United Mine Workers of America, its officers, members, agents, or representatives, to the unionization or the attempted unionization of the nonunion mines in Mingo county, W. Va., and Pike county, Ky.; but this injunction and restraining order is not to be interpreted or understood to prevent the payment by Wm. Green, secretary-treasurer of the United Mine Workers of America, of sufficient funds to the members of said United Mine Workers of America, now living in tents, or out of employment, in Mingo county, W. Va., and Pike county, Ky., for their actual necessities, until the further order of this court, this exception, however, not to include any person or persons not bona fide miners and not now members of said United Mine Workers of America and their dependents."

This is an appeal from an interlocutory decree of injunction. The controversy has its roots in the alleged conspiracy of mine operators in the Central competitive field (Western Pennsylvania, Ohio, Indiana, and Illinois) with their miners, members of the United Mine Workers of America, a voluntary unincorporated labor union, to coerce the mine

operators of the Williamson district (Mingo county, W. Va., and Pike county, Ky.), who are conducting closed nonunion mines, into unionizing their mines, to the injury of their rights in interstate commerce, secured to them by the Constitution and laws of the United States.

Appellee's bill named as defendants the United Mine Workers of America, the president, vice president, and secretary-treasurer thereof, numerous individuals described as members of the executive board, 24 district local unions of the United Mine Workers, and numerous individual and corporate mine operators. On motion the District Court dismissed the bill as to the United Mine Workers, the district locals, and all the individuals described as officers of the United Mine Workers, except appellants Gasaway and Van Horn, who are citizens and residents of Indiana, and who alone were within the jurisdiction of the District Court of Indiana.

This appeal is prosecuted by Gasaway and Van Horn. Inasmuch as the mine operators, defendants below, are not parties to this appeal, the decree is not reviewable as to them, except so far as it may affect the rights of these appellants.

[1] Because the bill states a good cause of action, and because the decree is merely interlocutory, nothing is now involved but the question whether the decree clearly discloses an improvident exercise of judicial discretion.

[2] In examining that question, we accept as conclusive the District Court's findings of fact based on appellee's verified bill and affidavits, and we ignore the issues of fact which may be tendered in the answer hereafter to be filed, and which are now forecast to some degree in the affidavits filed on behalf of appellants.

Respecting the facts a contention is made that appellee's showing did not warrant a finding that the armed insurrection and other unlawful doings in the Williamson district were advised or aided by appellants. We find no direct evidence to that effect; but the evidence of the continuing conspiracy, of the continuous efforts of the executive officers of the United Mine Workers to accomplish the object of the conspiracy, of the employment of similar violent and terrorizing means in the Panhandle and other districts of West Virginia, and of appellants' continuance as executive officers, justified the inference that the unlawful acts in West Virginia met their approval, and therefore, further inferentially, were supported by their advice and assistance. If, when on final hearing all the evidence is presented orally and tested by cross-examination, it shall appear that the wrongdoers in West Virginia were not the agents and representatives of appellants, the complaint will of course be dismissed as to them. Eagle Glass & Mfg. Co. v. Rowe, 245 U. S. 275, 38 Sup. Ct. 80, 62 L. Ed. 286.

[3] In order to measure the justifiable scope of this interlocutory decree, it is necessary to have in mind the nature and object of the bill, the property that requires protection, the interest of parties in that property, and what decree is indispensable, in view of the respective rights of the opponents in this suit, to afford complete protection.

[4-6] Injunction is an extraordinary remedy. It is limited to the protection of property from unlawful invasion. Execution in advance of a full hearing and final determination of the issues is a drastic meas-

ure, which may deprive defendants of rights confirmed in them by the final decree. Because the preliminary injunction is necessarily so drastic in its nature, great care should be had in exercising the discretion. What we have already said with respect to the facts indicates our approval of the granting of a preliminary injunction herein of whatever scope is necessary to protect the property before the court. But no injunction, preliminary or final, should forbid more than the particular unlawful invasions which the court finds would be committed except for the restraint imposed. Swift v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Hitchman Coal Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461.

[7] Appellee's property, which was being injured by appellants' trespasses (which, unless enjoined, would be continued), was its business of mining coal and shipping it in interstate commerce. But appellee alleged that it filed its bill on behalf of itself and 62 other operators of closed nonunion mines in the Williamson district. They did not appear as co-complainants. They were not named in the bill. Neither by names of the companies nor by description of their properties (as apparently required by section 20 of the Clayton Act [Comp. St. § 1243d]) were the mines identified which appellants and their agents and representatives in the Williamson district were to let alone. There was no allegation nor affidavit that there were only 63 operators of mines or 63 operators of closed nonunion mines in the district. Affidavits seem to indicate, but somewhat ambiguously, that there were 80 to 90 operators of closed nonunion mines in the district. Appellee averred that it was "impracticable" to name or to join the other operators of closed nonunion mines in the district. Neither averment nor proof tells why the pleader thought it impracticable. If we were to dispose of the matter on judicial notice of other proceedings in equity, we should say that it was not impracticable for appellee to identify the operators of closed nonunion mines in Mingo county, W. Va., and in the adjoining fringe of Pike county, Ky., and to ascertain whether trespasses upon their properties had also been committed by appellants and others, and whether they desired to join in the suit. At all events, the only identified property now before the court is appellee's. We cannot pass in advance upon the right of absent and unidentified operators to join or to be counted as co-complainants; but it may not be inappropriate to say that we are not informed of any departure of the Supreme Court from the limitation upon joinder stated in Scott v. Donald, 165 U. S. 107, 116, 17 Sup. Ct. 262, 265, 41 L. Ed. 648:

"The interest that will allow parties to join in a bill of complaint, or that will enable the court to dispense with the presence of all the parties, when numerous, except a determinate number, is not only an interest in the question, but one in common in the subject-matter of the suit."

At this point, on account of the scope of the restraint put upon appellants, it may be well to emphasize what this case is not. It is not an indictment to punish conspirators for their crimes. It is not a bill in the public interest by the government, as parens patriæ, to enjoin or dissolve an unlawful conspiracy or combination in restraint of trade. It is not a private bill of the kind where the injury to the complainant's

property was so indirect, as when caused by a secondary boycott in violation of the Sherman Act, that an injunction could not be maintained until specifically authorized by the Clayton Act. Paine Lumber Co. v. Neal, 244 U. S. 459, 37 Sup. Ct. 718, 61 L. Ed. 1256; Duplex Co. v. Deering, 254 U. S. 443, 41 Sup. Ct. 172, 65 L. Ed. 349. Inasmuch as appellee's bill is the oldtime and familiar one to protect property from injury through continuing direct trespasses thereon, proof of the iniquitous conspiracy between the United Mine Workers and the operators of the Central competitive field was useful only in showing that the illegal acts of the tort-feasors in the Williamson district would be continued, unless restrained, and that appellants in Indiana were parties to the threatened invasions. For it was not the conspiracy that was inflicting the damage to appellee's property.

[8] Bill and affidavits show the following trespasses upon appellee's property rights in interstate commerce: Destruction of appellee's property used in operating its mine; interference with and intimidation of appellee's officers, agents, and employees, by armed forces, by assaults, by threatening and abusive language, and by intrusions upon their privacy without invitation or consent; inducing appellee's employees secretly to change from nonunion to union men, and to remain in appellee's employment in violation of their contracts, the terms of which were known to the trespassers; and in using money, sent into West Virginia by the United Mine Workers' general or executive officers, to aid in the commission of the foregoing trespasses. All these unlawful acts (none of which was specified in the decree) should be enjoined by the preliminary injunction, with leave to the District Court to restrain other specifically threatened trespasses upon appellee's property rights, if any is shown.

But appellee was not satisfied with such a decree. It asked that the United Mine Workers be dissolved or enjoined from functioning, on the ground that it is a seditious and otherwise unlawful organization. The District Court declined to find that the union is an unlawful body. But, as we have already indicated, appellee must stand solely on its own private rights; appellee is not the guardian of others; appellee is not the vindicator of the public's rights, criminal or civil; and it was not the conspiracy, but the trespasses of joint tort-feasors, who are liable independently of the conspiracy as a ground of action, that inflicted the injury upon appellee's property.

[9-11] Appellee sought and obtained a decree restraining "the unionization or attempted unionization of the nonunion mines" in the Williamson district. Appellants, and their agents and representatives in West Virginia, are thus enjoined from publishing lawful union arguments and making lawful union speeches in the closed district; from making lawful appeals to those in the pool of unemployed labor to join the union rather than the nonunion ranks; and from using lawful persuasion to induce any one of appellee's employés to join the union and thereupon instantly and openly to sever his relationship with appellee, not in violation of, but in exact accordance with, his contract with appellee. Manifestly the purpose of such publications, public speeches, and personal persuasions would be to enlarge the membership of the union. If completely successful, these means would compel appellee,

if it staid in business, to deal with the union, and thus "unionize" its mine, and use of these means, short of complete success, would be an "attempted unionization." This broad sweep of restraint makes it necessary to refer briefly to the rights of employers and of labor unions. Unions of owners of capital may bargain collectively, through their officers, with laborers either individually or collectively. Unions of laborers may bargain collectively, through their officers, with employers either individually or collectively. Employers may bargain for a closed nonunion shop. Laborers may bargain for a closed union shop. Both are entitled to free and equal access to the pool of unemployed labor, for the purpose of securing recruits by peaceable appeals to reason. Employers may persuade a union man, provided they do not violate his right of privacy nor invade the rights of another, to become nonunion. Union laborers may under the same conditions persuade a nonunion man to become union. If the arguments of the owners of closed nonunion shops should be universally accepted, labor unions would have no ground of complaint, either legal or equitable, for their decline and fall. If the arguments of the advocates of the closed union shop should prevail, then similarly their opponents would have no legal or equitable cause of action. In either case the outcome would be due to the exercise of reason and free will. In this, as in every other instance of antinomy, of conflicting interests and mutually restricting rights, the rule of conduct is that each side shall so exercise its rights as not to injure the rights of the other. Hitchman Coal Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. ——, 42 Sup. Ct. 72, 66 L. Ed. —— (Dec. 5, 1921); Respective Rights of Capital and Labor in Strikes, 5 Illinois Law Review, 453. In the present state of the law, and without a constitutional exercise of the legislative power of regulation, appellee had no greater right to a decree suppressing lawful action (such as the publications, speeches and personal persuasions heretofore mentioned in this paragraph) in support of the closed union shop program than appellants had to a similar decree suppressing similar lawful action in support of the closed nonunion shop program. Neither side had any such right.

Appellee sought and obtained a decree enjoining the performance of existing contracts between the operators and their union employees in the Central competitive field with respect to what is called the check-off provision. So far as the contracts themselves and this record disclose, the check-off is the voluntary assignment by the employee of so much of his wages as may be necessary to meet his union dues, and his direction to his employer to pay the amount to the treasurer of his union. In that aspect the contract provision is legal, and quite evidently there are many lawful purposes for which dues may be used. If in truth the bargaining with respect to the contract was not free, if either the employee or the employer put the other under duress, the injured party might have cause to seek cancellation. (But if he had nothing to urge in the way of duress, except "economic necessity," he might not succeed.) If in bargaining one of the parties was not free, by reason of the greatly preponderant power of the other, the Legisla-

tures of these central states and the Congress might consider whether public interest required or justified the limitation of the otherwise existent freedom of contract by abolishing the check-off as a subject-matter of contract, in similitude to the legislative abolition of truck stores, dangerous appliances, unsanitary working places, exhausting hours, etc., as permissible subject-matters of contract. But appellee is not a party to the contract, is not the attorney of either contracting party, and is not the agency to establish the public welfare.

If nothing else should prevent appellee's being given that part of the decree now under consideration, the lack of injury to appellee by the existence of the check-off contracts would suffice. The injury to appellee's property rights in interstate commerce, of which appellee was apprehensive, was that it would be coerced into paying the high costs of production prevalent in the Central competitive field, and thus be unable to meet, or at least to meet so profitably, the existent competition in interstate commerce. As long as appellee is assured, as it now is, that it will have full protection in operating its closed nonunion mine and in marketing its coal in interstate commerce without interference, appellee should rather pray that all the elements causing high cost of production in the Central competitive field should be maintained.

[12, 13] But appellee insists that it is entitled to have the performance of the existent check-off contracts enjoined, because the check-off is the "heart" of the United Mine Workers' organization. Appellee is confusing a series of remote causations with the proximate cause of the injury. The only property that was injured was appellee's freedom in operating its mine and in putting its coal onto cars in West Virginia to be shipped in interstate commerce. The proximate cause of the injury was the described interferences in the Williamson district with appellee's aforesaid right to freedom. Without the direct and immediate interfering acts, the desires and intents of the conspirators in the Central competitive field would have been innocuous. In the series of causations the check-off provision was undoubtedly one of the elements. Manifestly unless money was collected, the union's executive officers could not send it into West Virginia to aid or promote the interfering acts. But in the same contracts that contain the check-off feature were provisions for the payment of wages and the recognition of the miners as human beings with the physical capacity to labor. On a parity with appellee's contention respecting the check-off element, all the other elements in the series of causation leading up to the proximate cause should also be enjoined. Money could not be sent into West Virginia by the executive officers, unless it was collected from the miners' wages; nor unless the miners earned wages; nor unless the miners were human beings having the capacity to labor.

From the record as it now stands we are convinced that the District Court committed substantial errors in exercising its judicial discretion in the following particulars: (1) In not confining the grant of relief to appellee; (2) in not limiting the prohibition of the unionization or attempted unionization of appellee's mine to the threatened direct and immediate interfering acts shown by the bill and affidavits; (3) in not limiting the prohibition of the sending of money into West Virginia to the use thereof in aiding or promoting the interfering acts; and (4)

in enjoining the performance of the existent check-off contracts in the Central competitive field.

The decree should be recast, and for that purpose the cause is remanded, with the direction to the District Court to enter a preliminary injunction decree which shall be in consonance with this opinion.