IJAMS et al. v. ANDREWS.

(Circuit Court of Appeals, Seventh Circuit. February 11, 1907.)

No. 1,283.

JOINT ADVENTURES—QUASI CONTRACTS—REPAYMENT OF MONEY.

Defendants associated themselves for the purpose of obtaining a franchise to furnish a municipality with gas for light and heat, and also with refrigeration, and for this purpose organized a corporation contemplating the issuance of full-paid and nonassessable stock, together with certain bonds. In order to obtain a franchise it was necessary for the promoters to pay $10,000 in cash to the city, which they promised to do, and for this purpose authorized C., one of the associates, who was cashier of a

bank, to obtain the amount. It was also necessary to purchase certain land as a plant site at a cost of $5,600, and C., in order to raise the money, borrowed the same from his bank on certain notes signed by certain of the associates, which he wrongfully used without their authority. The scheme was finally abandoned after the associates had agreed that all money which had been advanced by the parties to the agreement or by other parties should be refunded out of the first moneys realized from the sale of bonds of the corporation. *Held*, that C., in obtaining the money from the bank, acted solely as the agent of the associates, and that they were therefore under a quasi contractual obligation to the bank's receiver to repay the same.

In Error to the Circuit Court of the United States for the District of Indiana.

The plaintiffs in error were five of seven defendants named in the complaint of the defendant in error, in a suit to recover the amount of advances made by the Vigo County National Bank for their alleged use and benefit, and the writ of error is prosecuted from a judgment therein against the plaintiffs in error and another defendant, Gustav A. Conzman, who defaulted and declined to join in the writ. The remaining defendant named in the complaint was one George E. West, who was not made a party by service or appearance, and is not included in the judgment. Issue was joined between the present parties under the complaint in four paragraphs, two of which charged upon promissory notes signed by West and Miller, but averred to be the obligation of the seven defendants as associates, one charged for money had and received, and the fourth averred facts of joint association for purposes stated and moneys advanced by the bank for the use and at the instance and request of all. The hearing was submitted to the court, upon waiver of a jury—the first-mentioned two paragraphs founded upon promissory notes being dismissed—and special findings of fact were filed and judgment awarded thereupon.

Error is assigned for the conclusions of law upon the facts so found, which are preserved in the bill of exceptions—with no further questions raised—and are substantially as follows:

"(1) Some years prior to June, 1905, the Vigo County National Bank of Terre Haute, Ind., was organized as a corporation under the laws of the United States concerning national banks, and had been carrying on business in the city of Terre Haute, county of Vigo, and state of Indiana. On the 28th day of that month it ceased to do business, and Charles S. Andrews was appointed receiver by the Comptroller of the Currency of the United States, and since his appointment he has been, and still is, engaged in winding up the affairs of the bank under the direction of the Comptroller of the Currency.

"(2) Late in December, 1899, or early in January, 1900, all of the defendants associated themselves together for the purpose of procuring from the city of Terre Haute a franchise to supply the citizens of that city with refrigerating fluids and fuel and illuminating gas by conducting the same through pipes laid in the streets of that city, and in furtherance of their scheme they executed, and on the 1st day of March, 1900, filed in the office of the Secretary of State and in the office of the recorder of Vigo county, Ind.," an instrument which is set forth, executed by all the defendants, as written articles reciting their association "pursuant to the statutes of the state of Indiana for the organization of corporation," and stating (1) the corporation name to be "Terre Haute Pipe Line Company"; (2) that the capital stock shall be $500,000, in shares of $100; (3) that "the object of this association shall be to acquire, construct, own, and operate works for the manufacture and production of various fluids and the distribution of the same by pipe-lines for refrigeration, preservation, and fire protection, and to furnish the same to public and private consumers, and the manufacture and distribution by pipe lines of heating and illuminating gases, and to furnish the same to public and private consumers; and the production of the by-products connected with the operation of said works; and the sale of all said products"; (4) that the business shall be carried on in the city of Terre Haute; (5) that there shall

be seven directors; (6) naming each defendant as director to manage the affairs for the first year; and (7) that the "corporation shall have an existence of fifty years."

"(3) During the evening of the day the foregoing instrument was filed, all of the defendants met and elected defendant Ijams president, defendant Henry G. Miller vice president, and defendant Gustav A. Conzman secretary and treasurer, the last-named defendant being also cashier of the Vigo County National Bank.

"At this meeting defendant Hamill explained to all the other defendants that they would probably have to pay to the city of Terre Haute for the desired franchise $10,000, or perhaps as much as $20,000, and that as an evidence of good faith they would also have to purchase probably a lot upon which to construct their plant.

"(4) On March 2, 1900, all of the defendants, except the defendant West, appeared before the board of public works of the city of Terre Haute and presented an application for the franchise they desired, made out in the name of the Terre Haute Pipe Line Service Company, and offered to pay for the franchise $10,000, or furnish free gas to all city buildings. After negotiations had been continued for some days, the board of public works and the defendants reached an agreement which was reduced to writing and executed under date of March 24, 1900, the agreement on the part of the defendants being made in the name of the Terre Haute Pipe Line Service Company, and executed by defendant Ijams as president, and defendant Conzman as secretary. This agreement, among other things, provided that the Terre Haute Pipe Line Service Company should within 20 days from the approval of the agreement by the common council of the city of Terre Haute, Ind., pay into the city treasury $10,000, and that the company should within two years spend not less than $100,000 in the construction of its plant, and should also give a bond to the city in the sum of $10,000 conditioned for the faithful performance of the agreement on the part of the company. On April 3, 1900, the agreement, with an ordinance approving and ratifying the same, was submitted to the common council and referred to a committee. On April 10, 1900, at the next meeting of the common council, an agreement with the Terre Haute Pipe Line Service Company, signed by defendant Ijams, as president, and defendant Conzman, as secretary, was approved, in which it was recited that the $10,-000 called for by the contract of March 24, 1900, had been paid into the city treasury, and it was agreed that the sum so paid should never be refunded under any circumstances. The ordinance approving the contract of March 24, 1900, was then taken up and passed.

"(5) It became known on the 15th day of March, 1900, that the board of public works would make the contract, which was afterwards executed under date of March 24, 1900, and within a day or two afterwards all of the defendants met and decided upon a plan of campaign for getting the contract approved by the common council, and, among other things, agreed that certain members of the council should be seen by certain of the defendants. At the close of this meeting, defendants West and Miller, at the suggestion of defendant Conzman, signed two blank printed forms of notes used by the Vigo County National Bank. Neither of these forms was dated, nor was any time of maturity stated. In one of them the sum of $10,000 was written, but in the other no amount was stated. Defendant Conzman stated at the time that it was not yet known what amount it would take to purchase the site for the plant, and that he would get both notes signed by some of the other defendants before they were used.

"(6) On April 24, 1900, all the defendants met, and the president and secretary were directed to accept the contract made with the city, and to provide for the bond called for in the contract, and the president and secretary, together with the consulting engineer, were authorized to locate and purchase property on which to erect the plant. The president and secretary were further authorized to make a contract with J. Motte Martin and Eugene F. Osborne, trustees, for license letters for certain inventions and discoveries pertaining to the production of carbon dioxide, and certain methods and devices for the utilization of said dioxide for refrigeration, preservation, and

fire protection, 'and also to make a contract with the Osborne Steam Engineering Company for doing the engineering work.

"(7) It became known to the defendants prior to the meeting of the council on April 3, 1900, that the ordinance approving the contract of March 24, 1900, would not be passed until the sum of $10,000 had been paid into the city treasury, and defendant Conzman on April 3, 1900, drew a check for $10,000 on the Vigo County National Bank, signed by him as treasurer, and payable to the order of the city treasurer. The amount of this check, after it had been indorsed by the city treasurer, was placed to the credit of the said treasurer with the Vigo County National Bank on April 7, 1900, and on April 12, 1900, an account was opened on the books of the Vigo County National Bank in the name of G. A. Conzman, treasurer, and this account on that date was credited and charged with $10,000. Defendant Conzman filled the blanks left in the note for $10,000 previously signed by defendants West and Miller by giving the note the date of April 10, 1900, and making it payable on demand, and had the same taken by the bank on the 12th day of April, 1900, all without the knowledge or consent of either West or Miller.

"(8) On May 23, 1900, a piece of real estate in the city of Terre Haute which had been selected by defendants Ijams and Conzman as a site for the plant was purchased for the sum of $5,600, and that amount was paid by defendant Conzman out of the funds of the Vigo County National Bank. Without the knowledge or consent of either defendant West or defendant Miller, defendant Conzman filled the blanks left in the other note signed by West and Miller by giving it the date of May 31, 1900, making it payable on demand, and fixing the amount as $5,600, and on May 31, 1900, had it taken by the bank, and caused an account to be opened that day on the books of the bank in the name of G. A. Conzman, to which the amount of the note was credited, and against which there were charged at different dates on and subsequent to May 31, 1900, amounts aggregating $5,600.

"(9) At the time the articles of association hereinbefore mentioned were filed, none of the capital stock mentioned in those articles had been subscribed, none of it was ever subscribed, and it was the intention of the defendants when they executed those articles that none of the capital stock should ever be subscribed by them or either of them. No meetings which purport to be meetings of the subscribers to the articles of association, or of the directors, were ever held except the two held on March 1 and April 24, 1900. No minute book in which the proceedings of meetings should be kept was ever provided or kept. No by-laws were ever adopted, and not a share of stock was ever subscribed or issued.

"On May 28, 1900, an agreement was made between the Terre Haute Pipe Line Service Company and J. Motte Martin and Eugene F. Osborne, trustees, in which it was provided that 40 per cent. of the capital stock, fully paid-up and nonassessable, should be issued to Martin and Osborne, trustees, in consideration of a license executed by them to the company granting the right to use the Osborne Pipe Line refrigerating system under patents held by the trustees; but concurrently with this agreement another was executed on the same day between the same parties in which it was agreed that $50,000 of the capital stock of the service company should be immediately issued, of which each director should receive $5,000, and Martin and Osborne should receive $15,000, for services rendered the service company; that the service company should authorize an issue of $400,000 of bonds, which should be sold from time to time in such amounts as would provide the service company with sufficient funds to acquire land for its plant, erect the same, and carry on the business for which it was incorporated; that the 40 per cent. of the capital stock to be paid over to Martin and Osborne, trustees, should be deposited with defendant Conzman in trust, and be released from the trust only by the written orders of the president or secretary of the service company in such amounts as such orders might prescribe, and to be used for the purpose of aiding and facilitating the sale of the service company's bonds; that, out of the first moneys realized from the sale of bonds, all moneys which had been advanced to the service company by the parties to the agreement or by other parties should be refunded, and that when the plant of the service company was fully completed and in successful operation, then the remaining $250,-

000 of capital stock should be issued and added to the stock remaining in the hands of the trustee, and the trustee should divide the total amount of the stock in his hands into two equal parts, one of which parts he should release from the trust and deliver to Martin and Osborne fully paid and nonassessable, and the other part fully paid and nonassessable, he should release from the trust and deliver to the defendants Ijams, Conzman, Hamill, Miller, Smith, and Goldsmith in such amounts as he might deem just and equitable considering the services rendered the service company by each of the persons named.

"(10) On April 1, 1902, an agreement was made between the city of Terre Haute and the Terre Haute Pipe Line Service Company, defendant Ijams signing the agreement as president of that company, and defendant Conzman as secretary, in which it was recited that the service company had paid to the city the sum of $10,000 and had purchased and acquired real estate at a cost of $5,600 on which to construct and erect a plant, and that the service company was desirous of erecting a plant, but would not have time to do so within the time limit fixed by the contract of March 24, 1900, and an extension of one year from April 10, 1900, was granted within which to erect the plant, provided a new bond covering the period of extension was filed and approved. The bond thus required in the sum of $10,000 was filed, with defendants Conzman, Miller, and Hamill as sureties. Nothing further was ever done looking to the erection of the plant. The entire scheme was wholly abandoned, and under date of September 12, 1904, the real estate which had been purchased as a site for the plant was sold for $5,500 cash, paid to defendant Ijams as president, and by him turned over to defendant Conzman as secretary and treasurer."

(11) Payments are stated as made from time to time and credited upon the two notes—of interest upon the note for $10,000, and of interest and partial payments of principal on the note for $5,600—whereof $2,628.70 is mentioned as paid by "defendant West." Demand was made of all the defendants for payment of the balance due the bank, which is stated to be $11,080.39.

Ferdinand Winter, for plaintiffs in error.

D. P. Williams and John G. Williams, for defendant in error.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts). The facts in this controversy, as found by the trial court, are not challenged, and error is assigned alone upon the conclusions of law. It is contended on behalf of the plaintiffs in error that no individual liability was created against them under the facts stated, and that the money was loaned either upon corporate credit, or upon the credit of the purported notes of Miller and West. On the other hand, the defendant in error contends that recovery is authorized upon the conceded facts of the association of the plaintiffs in error, as co-adventurers, both in procuring the franchise from the city of Terre Haute and the site for a plant, for the mutual benefit of the associates, and in obtaining and using the means advanced by the Vigo County National Bank to that end. If the findings establish such state of facts, the associates have received the moneys of the bank which, ex æquo et bono, they ought to repay, and, under the general rule at common law (Cary v. Curtis, 3 How. 236, 246, 15 L. Ed. 576; Nash v. Towne, 5 Wall. 689, 702, 18 L. Ed. 527; White v. National Bank, 102 U. S. 658, 661, 26 L. Ed. 250; Louisiana v. Wood, 102 U. S. 294, 298, 26 L. Ed. 153), the recovery in assumpsit is authorized. If the plaintiffs in error, together with Conzman and West, the other associates, acted or appeared to act as individuals, for individual benefit, in these steps, and were not recognized by the bank as mere representa-

tives of a purported corporation in its transaction, their obligation to the bank is unaffected by the question discussed in the briefs, whether they had formed a corporation either de facto or de jure; and whether the corporators became liable through abandonment of their venture. Obligation predicated upon the equitable doctrine referred to does not involve inquiry as to the liability incurred by stockholders for corporate indebtedness, arising from want of complete organization, abandonment, or other cause, either statutory or at common law.   The question in this aspect is whether the plaintiffs in error obtained the benefits of the money advanced by the bank through mistake or imposition (Louisiana v. Wood, supra, and 9 Notes U. S. Rep. 1083), or other circumstances which oblige them "by the ties of natural justice and equity to refund" (Cary v. Curtis, 3 How. 247, 15 L. Ed. 576); and for its solution the facts are neither complicated nor doubtful, as we believe, under the findings.

The project of procuring a franchise from the city of Terre Haute to supply the citizens with refrigerating fluids and heating and illuminating gases was the joint undertaking, for mutual benefit, of the several plaintiffs in error and Conzman and West.   All of the associates, except West, attended the meetings of the board of public works of the city, and took part in the negotiations for such franchise and in making the offer to pay the municipality $10,000 therefor, and all were alike active in procuring approval of the contract by the common council.   In furtherance of the project, the associates executed and filed articles, purporting to form a corporation to become the grantee of the proposed franchise, under the name of "Terre Haute Pipe Line Service Company," the articles stating that the capital stock "shall be five hundred thousand dollars," and naming the several associates as directors for the first year.   Officers were elected, Conzman being chosen secretary and treasurer.   While the findings state that the parties became associated for the purpose of procuring the franchise from the municipality, "late in December, 1899, or early in January, 1900," the above-mentioned corporate form was adopted March 1, 1900, and their negotiations for the franchise commenced on the following day.   No capital was paid in and no capital stock was subscribed for or issued at any time, and neither of the associates contributed any funds to the purported corporation, nor was any subscription or cash payment for stock intended by either of the associates.   Issues of stock and of bonds was contemplated, but not carried out, whereby shares of stock, "fully paid and nonassessable," were to be apportioned to these associates for their services as promoters, and bonds were to be sold to provide funds for the purchase of lands, erection of plant, and operation of the business; and "out of the first moneys realized" from such sale it was expressly agreed that "all moneys which had been advanced to the service company by the parties to the agreement, or by other parties, should be refunded."

With no funds raised for the purpose, therefore, the individual associates not only solicited the franchise, but promised the payment of $10,000 and performance of other conditions precedent to the grant, and understood and discussed the necessity to have means provided for such cash payment, and that, "as evidence of good faith, they would also have to purchase probably a lot upon which to construct the

plant," to secure approval by the common council. There is no finding that they made any express agreement or direction for providing these means. It is found, however, that the associate Conzman, who was, as well, cashier of the Vigo County National Bank, was actively engaged with the plaintiffs in error, as co-adventurer, throughout the project, both in the efforts to obtain the franchise and in their meetings to carry out the objects; that, at the close of their conference which "decided upon a plan of campaign for getting the contract approved by the common council," Conzman produced "two blank printed forms of notes used by the Vigo County National Bank," which were then signed by the associates West and Miller, in blank, upon Conzman's suggestion and statement "that it was not yet known what amount it would take to purchase the site for the plant, and that he would get both notes signed by some of the other defendants before they were used."

The means for both requirements were obtained from the bank referred to, in this wise: (1) On April 3d, Conzman drew a check for $10,000, signed by himself with the appellation "Treasurer," payable to the order of the city treasurer, which was indorsed by and placed to the credit of the payee on the books of the bank April 7th; on April 12th an account was opened on the books of the bank, in the name of "G. A. Conzman, Treasurer," with credit and debit for $10,000, and Conzman at the same time filled one of the above-mentioned blank notes with that amount, dated it April 10th, made it payable on demand, and placed such note in the bank—"all without the knowledge or consent of either West or Miller." (2) On May 31, after the purchase of a proposed site for the plant, Conzman paid the purchase money, $5,600, from funds of the bank, by filling out the remaining blank note with that amount (no consent being given), placing the note in the bank, opening an account therein in the name of "G. A. Conzman," with a credit and debit covering the payment.

It thus appears that both sums were procured by Conzman at the bank through his relation as cashier, no concurrence appearing upon the part of any other bank official. The funds, however, were procured and used on behalf and for the benefit of all the associates, including himself, and Conzman was in no sense the representative of the bank in the contrivance to accomplish those objects. The purported corporation which was formed to take the franchise, was not only without substance in funds or property when the associates made their offers for the franchise and discussed the need to raise means to meet their promises, but no suggestion appears that such means were to be sought on corporate paper or credit. That they delegated to Conzman the making of arrangements for such means, for joint use and benefit, is unmistakable. With no capital provided for their embryonic corporation, it could not have been expected that any bank or money lender would advance the large amount required upon the strength alone of corporate credit, nor is it reasonable to infer that either of the parties understood the delegation to be so limited. Moreover, the subsequent agreement of the associates (May 28th), in reference to division of stock and issue of bonds for the enterprise, indicates their understanding that they were liable to be called upon for personal advances to meet these payments, as it was expressly provided that "all moneys which had been advanced

to the service company by the parties to the agreement, or by other parties, should be refunded" out of the "first moneys realized from sale of bonds."

As none of the associates offered to furnish the money out of hand, and all were to share the benefits of its use, it was reasonable for the delegate to assume, as he appears to have assumed, that any ultimate burdens would be borne by all; and in any view Conzman was plainly authorized to use the money when obtained for the intended joint benefit. So, in obtaining the money from the bank and applying it for their use, Conzman was exclusively their agent and representative—not acting as cashier, or on behalf of the bank—and the methods he employed for the transaction at the bank, whether with or without their sanction, furnish no ground for their defense in this suit. They are of force, however, by way of evidence (1) that Conzman and at least two of the other associates understood that the money was not to be raised upon corporate credit, and (2) that the transaction at the bank disclosed neither loans upon corporate credit, nor entries to charge the bank with acquiescence in a loan upon such credit.

Whether there was express agreement between the associates to join in notes for these loans does not appear, nor is such agreement essential upon this issue. The finding, in effect, that Conzman proceeded upon that view, to the extent of obtaining the signatures of West and Miller to blank forms of notes, with the promise to have them signed by others before use, but failed to carry out his promise, and made unauthorized use of such signatures, as purported vouchers for loans, in taking the moneys from the bank, establishes the fact that the bank was imposed upon, whatever the intention was on the part of Conzman respecting other signatures. The money thus taken, with or without the sanction of other officers of the bank, as a loan, was directly applied by Conzman to the intended use and benefit of the plaintiffs in error as coadventurers. Under the well-settled doctrine at common law, exemplified in the leading cases above cited, the money was obtained at their instance and applied for their use, and recovery is rightly awarded against them.

The judgment of the Circuit Court is affirmed.