## HARTSOUGH v. HIRSHHEIMER et al.,
### and three other appeals.

(Circuit Court of Appeals, Seventh Circuit. February 28, 1922. Rehearing Denied May 6, 1922.)

### Nos. 2944–2946, 2948.

1. Patents ⬉214—Cancellation of royalty contract held obtained by fraud of licensees.

Cancellation of a royalty contract, under which contract licensees were to manufacture, with exclusive right from licensors, tractors pursuant to the then unpatented design of licensors, paying a specified royalty, and were bound to pay the same royalty if in any way interested in the manufacture of any other tractor embodying any of the distinguishing features of licensors' design, *held* procured by fraud, and so properly set aside, and the contract restored; licensees having secretly and fraudulently obtained interfering patents, and falsely represented that their company was insolvent, and that they did not intend to continue manufacturing.

2. Patents ⬉214—Suit to set aside cancellation of royalty contract and for accounting held properly dismissed against subsequently formed corporation.

Suit by licensors to set aside cancellation of a royalty contract obtained by licensees by fraud, and to restore the contract, and for accounting, *held* properly dismissed as against a corporation formed, after the cancellation, by consolidation with another company of the corporation originally organized by licensees to manufacture tractors pursuant to licensors' then unpatented design.

3. Patents ⬉214—Both licensees held liable for royalties on setting aside of fraudulent cancellation of contract.

One of two licensees for manufacturing tractors pursuant to licensors' then unpatented design having participated in the fraud through which cancellation of their license and contract to pay royalty was obtained, and thereafter accepted without protest the benefits of the fraud of the other, to whom he had left the conduct of business of 'the corporation formed for the manufacture of infringing tractors, should, on the cancellation being set aside, be held equally liable with the other for royalties.

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeals from the District Court of the United States, for the Western District of Wisconsin.

Suit by Ralph B. Hartsough and others against Albert Hirshheimer and others to set aside cancellation of a royalty contract and for an accounting. From the decree granting relief to a certain extent, four appeals are taken, one by plaintiff Hartsough, one by John F. Robinson and others, administrators of plaintiff Patrick J. Lyons, deceased, one by defendant Hirshheimer, and one by defendant Benjamin F. Hamey. Affirmed in part, and in part modified.

Certiorari denied 43 Sup. Ct. 13, 258 U. S. ——, 66 L. Ed. ——.

A. C. Paul, of Minneapolis, Minn., H. L. Butler, of Madison, Wis., and Frank J. Morley, of Minneapolis, Minn., for appellants Hartsough and Robinson.

Charles H. Aldrich, of Chicago, Ill., and Frank M. Hoyt, of Milwaukee, Wis., for appellees.

George H. Gordon, of La Crosse, Wis., for appellee La Crosse Tractor Co.

Before BAKER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. On August 24, 1915, a royalty contract, herein called contract, was made in writing, fixing the terms and conditions under which Hirshheimer and Hamey, herein called licensees, were to manufacture tractors pursuant to the then unpatented design belonging to Hartsough and Langlois, herein called licensors. On November 16, 1916, an agreement in writing, herein called the cancellation, was made between the same parties and the Happy Farmer Tractor Company, canceling the contract. On March 11, 1918, licensors and Patrick J. Lyons brought suit in the United States District Court for the Western District of Wisconsin, on the equity side, against licensees and La Crosse Tractor Company, a corporation, charging fraud in procuring the cancellation, and praying that it be set aside, that the contract be held to be in full force, and for an accounting, etc. A decree was entered, which set aside the cancellation and restored the contract, and gave judgment against Hamey for all royalties, in accordance with the prayer of the bill, and against Albert Hirshheimer for a small sum only. The bill was dismissed as to La Crosse Tractor Company.

All parties except Langlois and the La Crosse Tractor Company have appealed. The appeals have been heard and considered together. No. 2944 is the appeal of Hartsough, whose chief complaint is that the court erred in not rendering the same judgment against Hirshheimer as was rendered against Hamey, and in dismissing the bill as to the La Crosse Tractor Company; in No. 2945 John F. Robinson and Minnesota Loan & Trust Company, as administrators of Patrick J. Lyons, deceased, appeal, and their principal complaint is the same as that of Hartsough; in No. 2946 defendant Hirshheimer complains of the setting aside of the cancellation, and urges that no judgment should have been rendered against him; and in No. 2948 Hamey's objections are directed to the same matters as they operate against him.

The evidence in the case consisted of depositions and exhibits and of testimony of witnesses in open court. There was an interlocutory decree and an order for accounting made by Judge A. L. Sanborn, be-

fore whom the hearing was had, and after his death the final decree was entered in the District Court by Judge Geiger, who followed substantially the interlocutory decree and in most respects the findings made by the master. In Judge Sanborn's memorandum of decision filed it is said:

"The defendants Hirshheimer and Hamey and the Happy Farmer Company by their authorized agents fraudulently misrepresented the intention of such defendants and that company in respect to the future manufacture of tractors by it or its successors. This representation was relied on by plaintiffs, and was material. * * * The release agreement should be rescinded as prayed, as to Hirshheimer and Hamey, but not as to the La Crosse Tractor Company."

The contract, after various recitals, sets out the terms in considerable detail. Licensors' undertakings were, in substance, as follows: First, licensees' rights were to be confined to the United States; second, licensors were to use their best efforts to obtain patents, and were to communicate further improvements to licensees, who should have the power to make and use the same in connection with the manufacture and sale of tractors, without payment of any further royalty; third, licensors would not give any rights in connection therewith to any person in the United States, nor themselves become connected with the manufacture, sale, or disposal of any tractor except in connection with said agreement.

Licensees, in addition to the agreement to pay 3 per cent. royalty, were to do the following things: First, render full statement on the 1st of each month; second, give licensors access to the books; third, name and number of each tractor was to be affixed thereon; fourth, parties were to agree upon a trade-mark, and the tractor was thereafter to be advertised under such name, with the exclusive right in the licensees to use the name and trade-mark as long as the conditions of the contract were fulfilled; fifth, in the event of licensors becoming reinvested with the rights of licensees, then the trade-mark to belong to, and title and right to use the same to be in, the licensors; sixth, the licensees "shall not, either directly or indirectly, use or employ the said invention, tractor, or any improvement or device therewith connected or in any manner aid or be interested in the making or selling of any other tractor embodying any of the distinguishing features of this tractor, without the written consent of the parties of the first part [licensors], and the payment of royalties thereon in the same amount, manner and time as herein provided"; seventh, if licensees "manufacture or sell, or cause to be manufactured or sold, directly or indirectly, in whole or in part, any other tractor which embodies any of the distinguishing features or parts of this tractor, or any tractor which may be developed or improved from the design herein contracted on, then it is understood and agreed that any and all such tractors shall come within this contract, and shall be manufactured and sold under this agreement, and royalties shall be paid thereon to the parties of the first part [licensors]"; eighth, licensees agree not at any time to dispute the validity of any patent applied for or to be used by said licensors in respect to said tractor, or any parts thereof; ninth, licensees may form a corporation for the manufacture of tractors, and the contract may be assigned to it, but "such transfer shall not in any way relieve the second

parties herein [licensees] from their liability to the first party [licensors] under this contract."

Among the first things done by licensees was the incorporation of the Happy Farmer Tractor Company, with Hamey as president and both licensees as directors. The contract was assigned to the corporation by licensees, who received in payment therefor $152,600 of its full-paid capital stock. The corporation assumed and agreed to perform all the conditions and stipulations as provided in the contract to be performed by the licensees. Such transfer did not in any way relieve licensees from their obligations under the contract. So far as appears, there was no written agreement between licensees fixing their relations to each other. Therefore the contract and the conduct of the parties must be looked to in determining their relations and the obligations arising therefrom, if any, to licensors.

In November, 1915, the Happy Farmer Company made a contract with the Gile Tractor & Engine Company, of Ludington, Mich., for motors, and also made two contracts for the tractors themselves, one with the Sta-Rite Engine Company, of La Crosse, of which A. Hirshheimer's son, H. J. Hirshheimer, was secretary and treasurer, and the other with the Wilcox Motor Company, of Minneapolis. The La Crosse Plow Company, of which A. Hirshheimer was president, was a selling agent. The manufacture and sale of tractors seems to have been a success from the start, and there does not seem to have been encountered more than the usual difficulties attending the making and marketing of a new machine. A large number of machines was sold. The first price was $495, but was advanced until in July, 1916, it was $585. Hartsough filed four applications for patents, one in 1913, two in 1915, and one in 1916, upon all of which patents were ultimately issued.

The main facts of importance here center around efforts, commenced very soon after the corporation was formed, by Hamey, the Happy Farmer Company, and Hirshheimer to procure a patent upon an invention made by one Melcher, then an employé of the Happy Farmer Company, and by some persons soon after, under circumstances hereinafter related, to get a patent on a tractor designed by one Gile, of the Gile Tractor & Engine Company, of Ludington, Mich. (of which J. S. Stearns was president), mentioned above as the maker of the motors for the Hartsough tractor. Patents were granted on the Melcher and Gile applications, and they later came into interference with, and were defeated by, the Hartsough patents. Another important fact is that late in March or April, 1916, after the facts were all gathered and the applications filed in the Gile and Melcher matters, Hamey discovered that they could not afford to pay the Hartsough royalties.

Before the contract was signed, one Dickinson, a collector and patent expert in the employ of the La Crosse Plow Company, of which A. Hirshheimer was president, gave Hirshheimer and Hamey, both old and experienced manufacturers, an opinion, telling them that the Hartsough tractor fell within the lines of an old and worn-out art. In the fall of the same year, after the formation of the Happy Farmer Company, Dickinson was sent to Iowa to look up an old Melcher tractor, of which licensees had heard. In the spring of 1916, A. Hirshheimer em-

ployed Dickinson to make application for a patent covering the Melcher design. While Dickinson testifies that he thought Gerlach, an attorney in the employ of the La Crosse Plow Company and afterward in the employ of the Happy Farmer Company, knew nothing of the Melcher applications, yet the three Melcher applications filed are all signed by Gerlach as Melcher's attorney.

On February 20, 1916, while passing through the ball park at Ludington, Mich., on his way to the Gile factory, the witness McConville, an employé of the Happy Farmer Company, saw an old tractor that had been made and discarded by Gile. He told Hamey about it, and Hamey, on February 27, 1916, while at the Gile factory, went to the ball park and saw the tractor. That afternoon, in the office of the Gile factory, in the presence of Gile and Stearns, Hamey was introduced to James H. Dean, the patent solicitor or expert. Hamey denies talking with Dean or any one else about the old Gile tractor, and says that he only said to Dean:

"If you are a good, well-posted man on patents, it may be that I will want you to help us push through the Hartsough patent," etc.

On March 4th the Gile tractor was moved in the ball park, and on March 10th was taken from the park and put into a barn. When the tractor was moved on March 4th, Dean was already in the employ of the Happy Farmer Company. Gerlach says that on March 7, 1916, Dean employed him to make the application for the Gile patent. That application was filed in Washington on March 22, 1916.

On or before March 8, 1916, Dickinson, pursuant to arrangement made a considerable time before that, and on the theory that he was to help Hartsough's attorneys in procuring patents on the Hartsough applications, went to Minneapolis, on Hamey's request, as attorney for the Happy Farmer Company, and procured letters from Hartsough that enabled Dickinson to have access to all information about the Hartsough claims as disclosed by the records in the Patent Office. Dickinson was to go to Washington to push the Hartsough patent, also the Melcher patent, but Hartsough did not know about the latter. Two or three days after Dickinson got the letters at Minneapolis, he went to Chicago and met Dean. Hamey had telegraphed to Dean. What happened in Chicago is not clearly disclosed, but Dickinson was told that Dean would take entire charge of the patent matters, so Dickinson did not go to Washington. That was on March 14, 1916. On March 16th Dean was examining a plow motor at the Happy Farmer factory in La Crosse. In the spring of 1916, and while Dean and Dickinson were working together in the employ of the Happy Farmer Company, Dickinson says he was sent out to California by H. J. Hirshheimer, an officer of the Sta-Rite Company, to look up an old tractor made under the Melcher design. He found, bought, and shipped that machine to H. J. Hirshheimer, who paid his expenses.

But this does not agree with Hamsey's testimony about the same matter. Hamey testified that Dickinson was going to California to make collections for the La Crosse Plow Company, and that he and A. Hirshheimer arranged to have him look up the machine in California, and the Happy Farmer Company was to stand one-half of the expenses.

Hamey says it was just at this time, in March or April, 1916, that they realized that they could not pay Hartsough's royalties. Dean had been to Minneapolis early in March, and got a retainer of $500 from the Happy Farmer Company. The record is utterly barren of any evidence that either Dean or Dickinson, both hired, as Hamey said, to push the Hartsough application for patent, did anything to that end. However, it does show very conclusively that both were working, as will later herein appear, to get the Gile and Melcher patents, both of which were in conflict with the Hartsough claims. Dean, in March, went to ·Minneapolis and instructed the Happy Farmer Company not to pay Hartsough royalties. A little later Dean was there trying to arrange with Hartsough for the release of licensees from the contract. Although Hamey was there with Dean several times, nothing was ever disclosed· to Hartsough about the many things being done by the Happy Farmer Company in connection with the Gile patent.

On April 18th Dean wrote Hartsough that, after an examination of all patents, "I have yet to find a patent which, in my opinion, could be cited as a reference against your invention." In that same letter he made reference to the Gile application, but in such a way as to allay, rather than to arouse, suspicion in Hartsough. Hamey, when asked by Hartsough about the Melcher application, deliberately and falsely told him that there had been none filed. Dean did not testify in this case, but Gerlach and Hamey deny that the Gile tractor was resurrected, and the application prosecuted thereon, with the knowledge or in the interest of the Happy Farmer Company or licensees. Hamey testified he was greatly worried when he finally heard an application had been filed, and speaks of Dean as having gone wrong by putting something through while in their employ, and yet they afterwards sent him as their agent to get a release from Hartsough. They were in almost daily correspondence with Dean and used him to deceive Hartsough into the belief that Dean had been hired to help Hartsough get his patent. Dean was the confidant of Hamey in the "disgraceful" letter, referred to below, and it was to be his hand that was to "pick" Hartsough. Whether Hamey or Hirshheimer or the Happy Farmer Company had any part in procuring the Gile patent, the fact remains that they never made any full and free disclosures to Hartsough of facts about the Gile invention, when those facts, injurious to Hartsough, came to their knowledge; on the contrary, they took, as against Hartsough, every advantage that the Gile patent afforded.

The letter of May 6th from the Happy Farmer Company, B. F. Hamey, president, to Dean, characterized by Hamey as a "disgrace," shows clearly that no honest effort was made to carry out the contract, but that everything was planned and directed to the end that Hartsough should be put in a bad position. By actual falsehood as to some matters and a withholding of information as to others, they contrived to make him feel insecure and worried, and, in the language of the letter, got him "ripe and ready to pick." Within the same month another letter was written, this time to licensors, over the same signature, refusing to pay royalties "until we are assured.that the sole and exclusive right [to-manufacture tractors] will be granted to us." This letter

falsely claimed that it was the contract duty of licensors to procure patents that would be an absolute protection to licensees.

After considerable correspondence, the Happy Farmer Company wrote to licensors, on August 21st, telling them that Stearns, president of the Gile Company, had notified the Happy Farmer Tractor Company that on August 8th a patent had been issued to him on the Gile application, and that Happy Farmer Company was infringing by making the Hartsough tractor, that they knew Hartsough could not perform the contract, and that the Happy Farmer Company deemed it at an end. Those notices from Stearns were written by Gerlach, he says on request of Dean, to be sent by one of Dean's clients to another,—the client who sent the notice was then manufacturing the infringing device for the alleged infringer.

Some negotiations were had between licensors and licensees for settlement, but were broken off. About November 12, 1916, Gerlach went a second time to Minneapolis, as attorney for the Happy Farmer Company and A. Hirshheimer. The negotiations were again taken up, and on the 16th the cancellation was signed. Prior to that time, in October, 1916, plans had been made, on the initiative and through the efforts of Hamey, to make a consolidation of the Sta-Rite Company and the Happy Farmer Company under a new corporate name, La Crosse Tractor Company. Hamey was to run the company, and it was to manufacture the Happy Farmer tractor.

On August 21, 1916, A. Hirshheimer attended a meeting of the board of directors of the Happy Farmer Company. Dean sat in that meeting by invitation. The minutes set out in detail much that Hamey and Dean had done to dispose of the Hartsough contract, and by unanimous vote, including that of A. Hirshheimer, the meeting approved all that had been done by both Hamey and Dean. A contract was there authorized for an interchange of business with the owners of the Gile patent. Licensees and their representatives had talked much about the financial embarrassment of the Happy Farmer Company, and when they came into the conference which resulted in the cancellation three things were kept constantly before Hartsough's attorneys: First, Gerlach repeatedly said the parties were to be placed in statu quo ante, from which all parties understood that they were to be put back in the position or situation each occupied before the contract; second, that the Happy Farmer Company was insolvent, and had to go through bankruptcy or do some other similar thing to wind up its business; third, that it did not intend to go ahead with the manufacture of the Hartsough tractor.

The evidence very clearly shows that there was no intention of placing either party in statu quo ante, as it was understood. On the contrary, what was intended and accomplished was to leave licensors with nothing except a few thousand dollars royalty and the right to fight for the allowance of a patent against a barricade set up against them by interfering patents, one of which, at least, was obtained by licensees while they were pretending to be helping licensors obtain their patent. On the other hand, licensees were left with a going concern, including the trade-mark and good will established in making and selling licensors' tractor. The Happy Farmer Company was probably not in-

solvent. Only $21,400 preferred stock and $10,000 common stock had been sold for cash. It was shown to have assets much in excess of all liabilities, except capital stock. Very soon after the cancellation, it went into the consolidation, and the La Crosse Tractor Company assumed all its obligations shown on the books and gave 200 shares of full-paid common and 214 shares of preferred stock for a like number of shares of the capital stock of Happy Farmer Company. It was not true that they did not intend to continue manufacturing the Hartsough tractor. The very night the cancellation was signed Hamey went to La Crosse for the purpose of putting the consolidation through. Just when they were talking most about insolvency and going out of business the Happy Farmer Company was making the necessary jigs, patterns, etc., to make the model B tractor after the Hartsough design. That was the model first and extensively made by the La Crosse Tractor Company. Within about 30 days after the cancellation, the Happy Farmer Company, without any apparent trouble, cleared up the Gile patent matter and got a license, and subsequently became the owner of it.

[1] While licensors knew some things that licensees and the Happy Farmer Company had been doing, and probably suspected others, before the cancellation, yet there were many things they did not know that fair dealing required that they should have been told. They did not recognize, as Gerlach confided to Dean, that Gerlach, A. Hirshheimer's attorney, there seeking the cancellation, was the solicitor that procured the Gile patent. The licensors did not know the true relations of the licensees with reference to the Gile or the Melcher patents, nor what they were planning to do, and afterwards actually did do, with reference to the making of the Hartsough tractor by the La Crosse Tractor Company. They did not know the true state of affairs with reference to solvency or insolvency. The same fraudulent and deceitful conduct that characterized the business up to the time of the settlement was carried into and continued in the conference room, and the cancellation was rightfully declared fraudulent and set aside, and the contract restored.

[2] We are of opinion that the case was properly dismissed as against the La Crosse Tractor Company.

[3] We are also of opinion that A. Hirshheimer is liable and should be held to the same extent as Hamey. When the cancellation was found to have been procured by his fraud, it followed, as a matter of law, that he should have been held to respond in damages.

There is another basis of liability as against him. Hirshheimer, though equally liable with Hamey under the contract, after as well as before the assignment to Happy Farmer Company, did nothing personally to carry out the purposes of the contract, but left it all to Hamey, and in several ways accepted a part of the reward received by Hamey for acts that were in violation of licensors' contract rights. Hirshheimer voted, as a director of the Happy Farmer Company, for the consolidation, and not only conveyed to the consolidated company all the property designed for and necessary to the carrying out of the contract, but he also took part of the stock voted by the Happy Farmer Company to Hamey for bringing about the consolidation. Under

the contract the trade-name should have been used as a name under which to build and sell motors, and should have reverted to the licensors in the event of cancellation of the contract; but Hirshheimer voted to and did help to place the good will and trade-name where, as the trial court said, it cannot now be reached. In every instance where the record shows that knowledge of wrongful things done by Hamey in the interest of the common undertaking, or in the interest of the corporation, of which licensees owned three-fourths of the capital stock at the beginning, came to Hirshheimer, he accepted everything, without protest. He is here insisting upon the cancellation, notwithstanding everything has long been disclosed to him in its true light, and notwithstanding the fact that the only ground on which they originally refused to pay royalties was removed by the granting of the Hartsough patents and the finding in their favor on all interferences. As is said in Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, at page 249, 38 Sup. Ct. 65, at page 72 (62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461):

"When any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in the furtherance of the common object, is the act of all."

See, also, Goldsmith v. Koopman, 152 Fed. 173, 81 C. C. A. 465; Ijams v. Andrews, 151 Fed. 725, 81 C. C. A. 109; United States v. Baxter (C. C.) 46 Fed. 350; Johnson v. Wallower, 15 Minn. 472 (Gil. 387).

Upon the appeals in No. 2946 and No. 2948, the decree is affirmed. Upon the appeals in No. 2944 and No. 2945, the decree is affirmed as to the La Crosse Tractor Company and Hamey, and is affirmed as to A. Hirshheimer as to all matters except the amount of the money decree; as to that, the decree is modified, so that a joint and several decree shall run against both Hirshheimer and Hamey for the amount of the decree against Hamey.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes